**STATE OF NORTH CAROLINA**
**COUNTY OF DUPLIN**

**IN THE GENERAL COURT OF JUSTICE**
**SUPERIOR COURT DIVISION**

*In re Goshen Medical Center, Inc. Data Incident Litigation,*

**FILE NUMBER: 25CVS2105**

**CONSOLIDATED CLASS ACTION COMPLAINT**

**JURY TRIAL DEMANDED**

<u>**CONSOLIDATED CLASS ACTION COMPLAINT**</u>

Plaintiffs Jamica Bass, Ruth Brunick, Geoffrey Caquias, Saundra Cooper, Veronica Darden, Francina Freeman, Arthur Maxwell, Decarlos McNair, Melissa Mealer, Gary Ortega, Jennifer Stuckey, Hope Tucker, Barbara White, Lynwood White, and Gloria Williams ("Plaintiffs"), bring this Consolidated Class Action Complaint against Defendant Goshen Medical Center, Inc. ("GMC" or "Defendant"), individually and on behalf of all others similarly situated, and allege, upon personal knowledge as to their own actions, and upon information and belief and their counsel's investigation and matters of public record as to all other matters, as follows:

<u>**NATURE OF THE ACTION**</u>

1.      This class action arises from a data security incident and data breach of Defendant's systems that involved Plaintiffs' and proposed Class Members' personally identifying information ("PII") and protected health information ("PHI") (collectively "Private Information").

1

Case 7:26-cv-00032-BO-BN    Document 4    Filed 02/23/26    Page 1 of 126
Electronically Filed Date: 1/22/2026 11:00 PM Duplin Superior Court County Clerk of Superior Court

2. Defendant is a federally qualified community and migrant health center organization organized under the laws of North Carolina, which provides healthcare to patients at 38 service locations.

3. On or around February 15, 2025, Defendant experienced a data breach that resulted in an unauthorized disclosure, exfiltration, and theft of its current and former patients' Private Information from Defendant's systems (the "Data Breach").[1]

4. The Private information compromised in the Data Breach included but was not limited to Plaintiffs' and Class Members' names, addresses, dates of birth, Social Security numbers, driver's license numbers, and medical record numbers.

5. Plaintiffs' investigation has revealed that ransomware group BianLian accessed Defendant's computer network and exfiltrated the Private Information of more than 450,000 current and former patients in the Data Breach, including Plaintiffs and Class Members.

6. Thereafter, BianLian posted Defendant's Data Breach to its dark web leak site, specifically referring to Plaintiffs' and Class Members' "PII and PHI records" that it exfiltrated. This confirms Plaintiffs' and Class Members' Private Information was targeted, accessed, and stolen in the Data Breach.

7. BianLian is an infamous ransomware developer, deployer, and data extortion cybercriminal group that has targeted companies globally using double-extortion models.[2]

---

[1] Copies of the Notice Letter Plaintiffs received from Defendant are attached as Exhibits A. *See also Data Breach Notifications—Goshen Medical Center*, ME. ATT'Y GEN., https://www.maine.gov/agviewer/content/ag/985235c7-cb95-4be2-8792-a1252b4f8318/e541449a-f3e3-4b69-93ed-c3f527fbc3a3.html (last visited Dec. 11, 2025).

[2] *#StopRansomware: BianLian Ransomware Group*, CISA (Nov. 20, 2024), https://www.cisa.gov/news-events/cybersecurity-advisories/aa23-136a.

8.      BianLian had unfettered access and acquired Plaintiffs' and Class Members' Private Information from the Defendant's systems for over two weeks, as Defendant did not discover the suspicious activity until March 4, 2025.

9.      That the hackers were able to infiltrate Defendant's information systems for over two weeks and perform malicious activity—including reconnaissance and data exfiltration functions that should have had alarm bells ringing—shows Defendant failed to implement reasonable, industry standard cybersecurity safeguards sufficient to detect malicious activity in a timely manner, including monitoring, logging, and alerting systems such as Endpoint Detection and Response (EDR), Extended Detection and Response (XDR), data loss prevention tools, and centralizing alerting and logging.

10.     In other words, Defendant wholly failed to implement means to prevent, detect, stop, or mitigate breaches of its systems, thereby allowing cybercriminals unrestricted access to its current and former patients' Private Information.

11.     Moreover, despite the fact Defendant became aware of the Data Breach on March 4, 2025, Defendant waited until September 17, 2025—over six months later and well past the industry standard or legally required timeline—to inform victims of the Data Breach by sending a Notice Letter.

12.     This timeline betrays a shockingly ill-prepared cybersecurity posture, particularly because N.C. Gen. Stat. § 75-65 requires the disclosure of a data breach to be "made without unreasonable delay."

13.     Defendant's prolonged investigation and response time demonstrate that Defendant lacks a reasonable incident response plan, which is an elementary aspect of any cybersecurity program and is designed to ensure timely responses and investigations.

3

14. Defendant's failures in even the most basic requirements of cybersecurity evidence that its cybersecurity program as a whole is severely inadequate in comparison to the measures Defendant is legally obligated to use to safeguard Private Information.

15. Defendant maintained, used, and shared Private Information in a reckless manner. In particular, the Private Information was used and transmitted by Defendant in a condition vulnerable to cyberattacks. Upon information and belief, the mechanism of the cyberattack and potential for improper disclosure of Plaintiffs' and Class Members' Private Information was a known risk to Defendant, and thus, Defendant was on notice that failing to take steps necessary to secure the Private Information from those risks left that property in a dangerous condition.

16. Defendant could and should have prevented the Data Breach; the Data Breach was a direct result of Defendant's failure to implement adequate and reasonable data security procedures and protocols necessary to protect patients' Private Information from the foreseeable and preventable cyberattack.

17. As a result of the Data Breach, Plaintiffs and Class Members, suffered concrete injuries in fact including, but not limited to: (i) invasion of privacy; (ii) theft of their Private Information; (iii) lost or diminished value of Private Information; (iv) lost time and opportunity costs associated with attempting to mitigate the actual consequences of the Data Breach; (v) loss of benefit of the bargain; (vi) lost opportunity costs associated with attempting to mitigate the actual consequences of the Data Breach; (vii) statutory damages; (viii) nominal damages; and (ix) the continued and certainly increased risk to their Private Information, which: (a) remains unencrypted and available for unauthorized third parties to access and abuse; and (b) remains backed up in Defendant's possession and is subject to further unauthorized disclosures so long as Defendant fails to undertake appropriate and adequate measures to protect the Private Information.

4

18.     Plaintiffs' and Class Members' identities and finances are now at risk because of Defendant's negligent conduct as the Private Information that Defendant collected and maintained has been accessed and acquired by data thieves. As a result of the Data Breach, Plaintiffs and Class Members have been exposed to a heightened and imminent risk of fraud and identity theft. Plaintiffs and Class Members must now and in the future closely monitor their financial accounts to guard against identity theft. Plaintiffs and Class Members may also incur out of pocket costs, including to purchase credit monitoring services, credit freezes, credit reports, or other protective measures to detect and deter identity theft.

19.     Indeed, Defendant has made clear that Plaintiffs and the putative Class Members should spend time monitoring accounts and attempting to prevent the imminent harm that they now face when Defendant instructed them to remain vigilant and enroll in credit monitoring services, all the while offering only the legally minimum credit monitoring services that are woefully inadequate to protect Plaintiffs from the harms they must now face as a result of the disclosure of their Private Information, including their Social Security numbers. [3]

20.     Plaintiffs bring this class action lawsuit on behalf all those similarly situated to address Defendant's inadequate safeguarding of Class Members' Private Information that it collected and maintained, and for failing to provide timely and adequate notice to Plaintiffs and other Class Members that their information had been subject to unauthorized access.

21.     Plaintiffs and Class Members have a continuing interest in ensuring that their Private Information is and remains protected because Defendant still has possession of their immutable data, thus entitling Plaintiffs and the Class to injunctive and other equitable relief.

---

[3] Ex. A.

22.     On behalf of themselves and the Class preliminarily defined below, Plaintiffs bring causes of action against Defendant for negligence, negligence *per se*, breach of implied contract, unjust enrichment, invasion of privacy, breach of fiduciary duty, and violation of the North Carolina Unfair and Deceptive Trade Practices Act, based on Defendant's failures to adequately protect their highly sensitive Private Information or provide prompt and complete notice of the Data Breach.

## PARTIES

23.     Plaintiff Jamica Bass is a resident and citizen of Dudley, North Carolina, where she intends to remain.

24.     Plaintiff Ruth Brunick is a resident and citizen of Hampstead, North Carolina, where she intends to remain.

25.     Plaintiff Geoffrey Caquias is a resident and citizen of Raeford, North Carolina, where he intends to remain.

26.     Plaintiff Saundra Cooper is a resident and citizen of Whiteville, North Carolina, where she intends to remain.

27.     Plaintiff Veronica Darden is a resident and citizen of Clinton, North Carolina, where she intends to remain.

28.     Plaintiff Francina Freeman is a resident and citizen of Council, North Carolina, where she intends to remain.

29.     Plaintiff Arthur Maxwell is a resident and citizen of Pikeville, North Carolina, where he intends to remain.

30.     Plaintiff Decarlos McNair is a resident and citizen of Goldsboro, North Carolina, where he intends to remain.

31.     Plaintiff Melissa Mealer is a resident and citizen of Richlands, North Carolina, where she intends to remain.

32.     Plaintiff Gary Ortega is a resident and citizen of Pikeville, North Carolina, where he intends to remain

33.     Plaintiff Jennifer Stuckey is a resident and citizen of Goldsboro, North Carolina, where she intends to remain.

34.     Plaintiff Hope Tucker is a resident and citizen of Clinton, North Carolina, where she intends to remain.

35.     Plaintiff Barbara White is a resident and citizen of Deep Run, North Carolina, where she intends to remain.

36.     Plaintiff Lynwood White is a resident and citizen of Deep Run, North Carolina, where she intends to remain.

37.     Plaintiff Gloria Williams is a resident and citizen of Goldsboro, North Carolina, where she intends to remain.

38.     Defendant Goshen Medical Center, Inc. is a North Carolina corporation with its principal place of business located at 412 SW Center St, Faison, North Carolina 28341. Defendant's registered agent, Chester Aycock, is located at PO Box 187, Faison, North Carolina 28341.

## JURISDICTION AND VENUE

39.     This Court has subject matter jurisdiction over this action under N.C. Gen. Stat. § 7A-240 and 7A-243. Specifically, this case is a civil dispute with an amount in controversy exceeding $25,000.

40.     This Court has personal jurisdiction over Defendant under N.C. Gen. Stat. § 1-75.4, because Defendant's principal places of business and registered offices are in this County and the acts and omission giving rise to Plaintiffs' claims occurred in and emanated from this County.

41.     Venue is proper under N.C. Gen. Stat. § 1-79(a) because Defendant's principal places of business are in this County and Defendant's registered offices are in this County.

## STATEMENT OF FACTS

*Defendant's Business*

42.     Defendant is a federally qualified community and migrant health center organization organized under the laws of North Carolina, which provides healthcare to patients at 38 service locations.

43.     Plaintiffs and Class Members are former and current patients of Defendant.

44.     As part of its business, Defendant receives, collects, and maintains the highly sensitive Private Information of its current and former patients. In doing so, Defendant implicitly promises to safeguard their Private Information.

45.     As a condition of receiving services from Defendant, Plaintiffs and Class Members were required to provide Defendant with their Private Information and in return, and they reasonably expected that Defendant would safeguard their highly sensitive and confidential information.

46.     The Private Information entrusted to Defendant by Plaintiffs and the Class includes, but is not limited to, their names, addresses, dates of birth, Social Security numbers, driver's license numbers, and medical record numbers.

47.     Defendant has obligations created by the FTC Act, Health Insurance Portability and Accountability Act ("HIPAA"), contract, common law, and industry standards to keep Plaintiffs'

and Class Members' Private Information confidential and to protect it from unauthorized access and disclosure.

48.     In collecting and maintaining the Private Information of Plaintiffs and Class Members, Defendant agreed it would safeguard the data in accordance with state law, and federal law. After all, Plaintiffs and Class Members themselves took reasonable steps to secure their Private Information.

49.     Indeed, Defendant understood the importance of implementing adequate cybersecurity measures and informed its patients in its Privacy Policy that it uses "administrative, technical, and physical measures to protect your information . . . . [and] tests our system for cybersecurity threats and use data encryption technologies to protect your personal information."[4]

50.     Plaintiffs and Class Members have taken reasonable steps to maintain the confidentiality of their Private Information. Plaintiffs and Class Members relied on Defendant to keep their Private Information confidential and securely maintained, and to make only authorized disclosures of this information.

51.     On information and belief, and despite promising to do so, Defendant has not implemented reasonable cybersecurity safeguards or policies to protect Plaintiffs' and Class Members' Private Information or supervised its IT or data security agents and employees to prevent, detect, and stop breaches of its systems. Rather, Defendant leaves significant vulnerabilities in its systems for cybercriminals to exploit and gain access to Plaintiffs' and Class Members' Private Information.

---

[4] *Privacy Policy,* GOSHEN MEDICAL CENTER, available at https://goshenmedical.org/privacy-policy/ (last visited January 18, 2026).

*The Data Breach*

52.     Despite its duties and alleged commitments to safeguard Private Information, Defendant did not in fact follow industry standard practices in securing Plaintiffs' and Class Members' Private Information, resulting in the Data Breach.

53.     Starting on or about Sept. 17, 2025, Defendant began sending Notice Letters to Plaintiffs and other victims of the Data Breach the Notice Letter, informing as follows:

> **What Happened?** On March 4, 2025, we detected suspicious activity within our network. . . . As a result, we determined that certain files may have been accessed or acquired without authorization on February 15, 2025. We then undertook a comprehensive review of the affected data and, on or about September 12, 2025, learned that some personal health information was involved. . . .

> **What Information was Involved?** The information may have included your name as well as your name, address, date of birth, Social Security number, driver's license number, and medical record number.[5]

54.     Omitted from the Notice Letter were the identity of the cybercriminals who perpetrated this Data Breach (now known to be BianLian), the details of the root cause of the Data Breach, the vulnerabilities exploited, and the remedial measures undertaken to ensure such a breach does not occur again. To date, these critical facts have not been explained or clarified to Plaintiffs and Class Members, who retain a vested interest in ensuring their Private Information is protected.

55.     Defendant's so-called disclosure thus amounts to no real disclosure at all, as it fails to inform, with any degree of specificity, Plaintiffs and Class Members of the Data Breach's critical facts. Without these details, Plaintiffs' and Class Members' ability to mitigate the harms resulting from the Data Breach is severely diminished.

---

[5] Ex. A.

56.     Despite Defendant's intentional opacity about the root cause of the Data Breach, several facts may be gleaned from the Notice Letter, including that (a) this Data Breach was the work of cybercriminals; (b) the cybercriminals first infiltrated Defendant's networks and systems, and downloaded data from the networks and systems (aka exfiltrated, or in layperson's terms "stole" the data); and (c) once inside Defendant's networks and systems, the cybercriminals targeted information including Plaintiffs' and Class Members' Private Information.

57.     Further, Defendant took over seven months after the Data Breach to complete its internal investigation and send the Notice Letters to inform the victims of the Data Breach and what particular information had been compromised. The timeline betrays a shockingly ill-prepared cybersecurity posture. Under N.C. Gen. Stat. § 75-65, disclosure of a data breach must be "made without unreasonable delay," which Defendant failed to do.

58.     Defendant's prolonged investigation and notice to the relevant state and federal authorities, as well as the impacted individuals, is strong evidence that Defendant lacks a reasonable incident response plan, which is an elementary aspect of any cybersecurity program and is designed to ensure timely responses and investigations.

59.     The lengthy and delayed Data Breach investigation revealed Defendant's cyber and data security systems were completely inadequate and allowed cybercriminals to obtain files containing a treasure trove of hundreds of thousands of its patients' highly sensitive Private Information.

60.     Further, in the Notice Letter Defendant contends to have taken steps to address the Data Breach and implement additional measures to prevent another Data Breach, but fails to elaborate or explain what those alleged steps are. Regardless, such steps should have been taken prior to the Data Breach.

61.     To date, Defendant has done nothing to provide Plaintiffs and the Class Members with relief for the damage they have suffered because of the Data Breach. Defendant has merely offered Plaintiffs and Class Members complimentary credit monitoring for a single year, despite the fact that experts recommend at least seven years.[6] But this does not compensate them for damage incurred and time spent dealing with the Data Breach. Signing up for this service requires Plaintiffs and Class Members to forfeit time that could otherwise be spent making money or enjoying life. Moreover, Defendant's credit monitoring offer came seven months after BianLian had stolen the Private Information and posted the Data Breach on its dark web leak site.

62.     Even with several months of credit monitoring services, the risk of identity theft and unauthorized use of Plaintiffs' and Class Members' Private Information is still substantially high. The fraudulent activity resulting from the Data Breach may not come to light for years.

63.     Because of Defendant's Data Breach, the sensitive Private Information of Plaintiffs and Class Members was placed into the hands of cyber criminals, inflicting numerous injuries and significant damages upon Plaintiffs and Class Members.

64.     Worryingly, the notorious "BianLian" ransomware gang claimed responsibility for the cyberattack in a post on its dark web website on March. 22, 2025.

65.     Shown below is BianLian's post on the dark web Leak website claiming responsibility for the Data Breach and specifically stating it stole "PII and PHI records":

---

[6] Chi Chi Wu, *Essentials About Credit reporting: Consumer Debt Advice form NCLC*, NAT'L CONSUMER L. CTR. (July 6, 2018), https://library.nclc.org/article/essentials-about-credit-reporting-consumer-debt-advice-nclc (explaining how most negative information stays on your credit report for seven years).



66.     BianLian is a notorious infamous ransomware developer, deployer, and data extortion cybercriminal group that has targeted companies globally using double-extortion models.

67.     The Cybersecurity and Infrastructure Security Agency (CISA) reports as follows:

Since June 2022, FBI has observed BianLian group affecting organizations in multiple U.S. critical infrastructure sectors." BianLian group originally employed a double-extortion model in which they exfiltrated financial, client, business, technical, and personal files for leverage and encrypted victims' systems. In 2023, FBI observed BianLian shift primarily to exfiltration-based extortion with victims' systems left intact, and Australia's Australian Cyber Security Center observed BianLian shift exclusively to exfiltration-based extortion. BianLian actors warn of financial, business, and legal ramifications if payment is not made.[7]

68.     Though Defendant has provided no public information on a ransom demand or payment, cybercriminals have *already leaked* the stolen Private Information of thousands of Defendant's current and former patients.

---

[7] CISA, *supra* note 5.

69. Through its inadequate security practices, Defendant exposed Plaintiffs' and the Class's Private Information for theft and sale on the dark web.

70. Further, Defendant's prolonged investigation and response time, in addition to the cybercriminal group BianLian's *modus operandi* of using a double extortion model, strongly suggests either that (i) Defendant only discovered the Data Breach upon delivery of a ransom note after BianLian completed most of its attack, or (ii) Defendant discovered the attack prior to the ransom note but could not prevent BianLian from accessing and exfiltrating Private Information stored on Defendant's network, both which are strong evidence that Defendant lacks a reasonable incident response plan—an elementary aspect of any cybersecurity program that is designed to ensure timely responses and investigations.

71. The Data Breach, which Defendant failed to detect until BianLian had already accessed Plaintiffs' and Class Members' Private information for over two weeks, is the direct result of Defendant's failure to implement basic data security measures over consumers' data in its custody and control. Had Defendant implemented reasonable cybersecurity measures— including adequate safeguards for initial access, encryption, or redaction of personal data elements, and sufficient logging, monitoring, and alerting tools to detect unauthorized activity—cybercriminals would not have been able to hack into Defendant's network, perform reconnaissance necessary to locate Plaintiffs' and Class Members' Private Information, and then exfiltrate that data before being detected.

72. The fact that BianLian was able to infiltrate Defendant's information systems, locate these valuable files, gain permission to these files, and download the data of more than 450,000 patients without ever being noticed shows how poor Defendant's cybersecurity program was at the time of the Data Breach. Basic safeguards for monitoring activity on a company's

14

network for anomalous and malicious activity should have identified BianLian's operations, especially when it began removing files.

73.    Further, even if these systems were in place, it appears Defendant failed to implement basic requirements to ensure such systems were logging alerts to a centralized system such that Defendant's employees would be empowered to respond to pertinent alerts. Thus, Defendant failed to take even slight care to guard against the highly foreseeable risk of a data breach.

74.    As the Data Breach and its timeline evidence, Defendant did not use reasonable data security measures appropriate to the nature of the sensitive Private Information collected from Plaintiffs and Class Members and maintained on Defendant's network server(s), such as encrypting the information, deleting the data from Defendant's server when it was no longer needed, requiring sufficient verification such as multi-factor authentication for accounts with access servers storing Private Information, training employees about cybersecurity and attempts to gain unauthorized access, investigating and addressing vulnerabilities in its data security practices, and/or implementing the necessary safeguards to enable Defendant to identify malicious activity and curtail it when it happens. These failures allowed and caused cybercriminals to target Defendant's network systems and carry out the Data Breach.

75.    Given the Defendant's failure in even the most basic requirements of cybersecurity, it is likely that Defendant's cybersecurity program as a whole is severely inadequate in comparison to the measures it is legally obligated to provide to individuals for whom it collects Private Information, thus leaving them exposed to the Data Breach that indeed came into fruition.

76.    Given that the hackers were able to infiltrate Defendant's information systems for an extended period of time and perform malicious activity—including reconnaissance and

exfiltration functions that should have had alarm bells ringing—it is likely that Defendant failed to implement reasonable, industry standard cybersecurity safeguards sufficient to detect malicious activity in a timely manner, including monitoring, logging, and alerting systems such as EDR, XDR, data loss prevention tools, and centralizing alerting and logging.

77.     Defendant could and should have prevented this Data Breach by ensuring its files and servers containing Plaintiffs' and Class Members' Private Information were properly secured, sanitized, and encrypted and by using appropriate clearinghouse practices to purge consumer data that it was no longer required to maintain, but it failed to do so.

78.     Defendant could and should have properly monitored its network for unauthorized access and unusual activity, including the downloading of large amounts of sensitive personal information from its network.

79.     Additionally, Defendant could have prevented the Data Breach by examining, testing, and updating its cybersecurity practices to ensure vulnerabilities were identified and addressed and reasonable safeguards were continuously maintained, but failed to do so.

80.     Defendant's tortious conduct and breach of contractual obligations, as detailed herein, are evidence of its failure to identify the scope of information involved and/or individuals impacted by the Data Breach until months after cybercriminals breached its network and accessed Plaintiffs' and Class Members' Private Information stored therein—meaning Defendant had no effective means in place to ensure that cyberattacks were detected, prevented, or timely investigated.

81.     Defendant's negligence in safeguarding Plaintiffs' and Class Members' Private Information is exacerbated by the repeated warnings and alerts regarding the need to protect and secure sensitive data, as well as the ubiquitous nature of data breaches.

82.    As a result of the Data Breach, Plaintiffs and Class Members now face an increased risk of fraud and identity theft, among many other actual and imminent damages.

83.    Moreover, Plaintiffs and Class Members have an interest in ensuring that their Private Information, which is believed to remain in the possession of Defendant, is protected from further breaches.

***The Data Breach Was Foreseeable to Defendant.***

84.    Plaintiffs and Class Members value their Private Information, as in today's electronic-centric world, their Private Information is required for numerous activities, such as new registrations to websites, or opening a new bank account, as well as signing up for special deals.

85.    In light of recent high profile data breaches, Defendant knew or should have known that its electronic records would be targeted by cybercriminals.

86.    In 2024, there were 3,158 data breaches with 1,350,835,988 victim notices, a 211% increase year over year.

87.    In April 2020, ZDNet reported, in an article titled "Ransomware mentioned in 1,000+ SEC filings over the past year," that "[r]ansomware gangs are now feroisiously aggressive in their pursuit of big companies. They breach networks, use specialized tools to maximize damage, leak corporation information on dark web portals, and even tip journalists to generate negative news for companies as revenge against those who refuse to pay."[8]

88.    In September 2020, CISA published online a "Ransomware Guide" advising, "Malicious actors have adjusted their ransomware tactics over time to include pressuring victims

---

[8] Catalin Cimpanu, *Ransomware Mentioned in 1,000+ SEC Filings Over the Past Year*, ZDNET (April 30, 2020), https://www.zdnet.com/article/ransomware-mentioned-in-1000-sec-filings-over-the-past-year/.

for payment by threatening to release stolen data if they refuse to pay and publicly naming and shaming victims as secondary forms of extortion."[9]

89.     Defendant's data security obligations were also particularly important given the substantial increase in data breaches in the healthcare industry preceding the date of this Data Breach. Because of the value of its collected and stored data, the medical industry has experienced disproportionally higher numbers of data theft events than other industries.

90.     Indeed, "Comparitech disclosed that in the first nine months of 2025, 293 ransomware attacks were recorded on hospitals, clinics, and other direct care providers. An additional 130 attacks targeted business within the healthcare sector, including pharmaceutical manufactures, medical billing providers, and healthcare tech companies."[10]

91.     The healthcare industry consistently reports as the industry with the highest, or one of the highest, number of data breaches.

92.     Further, in 2024, "the healthcare industry experienced a concerning surge in data breaches, with over 300 million patient records compromised—a 26% increase from 2023."[11]

93.     According to Advent Health University, when an electronic health record "lands in the hands of nefarious persons the results can range from fraud to identity theft to extortion. In fact, these records provide such valuable information that hackers can sell a single stolen medical record for up to $1,000."[12]

---

[9] *Stop Ransomware Guide*, CISA, https://www.cisa.gov/stopransomware/ransomware-guide (last visited Dec. 12, 2025).
[10] Anna Riberio, *Healthcare Ransomware Attacks Surge 30% in 2025, as Cybercriminals Shift Focus to Vendors and Service Partners*, COMPARITECH (Oct. 13, 2025), https://industrialcyber.co/reports/healthcare-ransomware-attacks-surge-30-in-2025-as-cybercriminals-shift-focus-to-vendors-and-service-partners/.
[11] BLUESENSE, BREACH BAROMETER ANNUAL REPORT 2 (2025), https://bluesight.com/wp-content/uploads/2025/02/2025-Breach-Barometer-Annual-Report.pdf.
[12] *5 Important Elements to Establish Data Security in Healthcare*, ADVENT HEALTH UNIV. (May 21, 2020), https://www.ahu.edu/blog/data-security-in-healthcare.

94.    Drug manufacturers, medical device manufacturers, pharmacies, hospitals, and other healthcare service providers often purchase Private Information on the black market for the purpose of target-marketing their products and services to the physical maladies of the data breach victims themselves. Insurance companies purchase and use wrongfully disclosed PHI to adjust their insureds' medical insurance premiums.

95.    According to an article in the HIPAA Journal posted on October 14, 2022, cybercriminals hack into medical practices for their "highly prized" medical records. "[T]he number of data breaches reported by HIPAA-regulated entities continues to increase every year. 2021 saw 714 data breaches of 500 or more records reported to the [HHS' Office for Civil Rights] OCR – an 11% increase from the previous year. Almost three-quarters of those breaches were classified as hacking/IT incidents."[13]

96.    Healthcare organizations are easy targets because "even relatively small healthcare providers may store the records of hundreds of thousands of patients. The stored data is highly detailed, including demographic data, Social Security numbers, financial information, health insurance information, and medical and clinical data, and that information can be easily monetized."[14]

97.    The HIPAA Journal article goes on to explain that patient records, are "often processed and packaged with other illegally obtained data to create full record sets (known as 'Fullz' package) that contain extensive information on individuals, often in intimate detail." The record sets are then sold on dark web sites to other criminals and "allows an identity kit to be

---

[13] Steve Adler, *Editorial: Why Do Criminals Target Medical Records*, The HIPAA J. (Nov. 2, 2023), https://www.hipaajournal.com/why-do-criminals-target-medical-records.
[14] *Id.*

created, which can then be sold for considerable profit to identity thieves or other criminals to support an extensive range of criminal activities."[15]

98.     Data breaches like the one experienced by Defendant have become so notorious that the Federal Bureau of Investigation (FBI) and U.S. Secret Service have issued a warning to potential targets so they are aware of, can prepare for, and hopefully can ward off a potential attack.

99.     In fact, according to the cybersecurity firm Mimecast, 90% of healthcare organizations experienced cyberattacks in 2020.[16]

100.    These significant increases in attacks on companies, particularly those in the healthcare industry, and attendant risk of future attacks, is widely known to the public and to anyone in that industry, including Defendant.

101.    A study by Experian found that the average total cost of medical identity theft is "nearly $13,500" per incident, and that many victims were forced to pay out-of-pocket costs for fraudulent medical care.[17] Victims of healthcare data breaches often find themselves "being denied care, coverage or reimbursement by their medical insurers, having their policies canceled or having to pay to reinstate their insurance, along with suffering damage to their credit ratings and scores."[18]

102.    Moreover, there may be a time lag between when harm occurs versus when it is discovered, and also between when Private Information is stolen and when it is used. According to the U.S. Government Accountability Office ("GAO"), which conducted a study regarding data breaches:

---

[15] *Id.*
[16] Maria Henriquez, *Iowa City Hospital Suffers Phishing Attack*, SEC. MAGAZINE (Nov. 23, 2020), https://www.securitymagazine.com/articles/93988-iowa-city-hospital-suffers-phishing-attack.
[17] Brian O'Connor, *Health Care Data Breach: What to Know About Them and What to Do After One*, EXPERIAN (Mar. 31, 2023), https://www.experian.com/blogs/ask-experian/healthcare-data-breach-what-to-know-about-them-and-what-to-do-after-one.
[18] *Id.*

[L]aw enforcement officials told us that in some cases, stolen data may be held for up to a year or more before being used to commit identity theft. Further, once stolen data have been sold or posted on the Web, fraudulent use of that information may continue for years. As a result, studies that attempt to measure the harm resulting from data breaches cannot necessarily rule out all future harm.

103.    It is incorrect to assume that reimbursing a victim for a financial loss due to fraud makes that individual whole again. Like the GAO's study, the Department of Justice's Bureau of Justice Statistics ("BJS") found that "among victims who had personal information used for fraudulent purposes, about a third (32%) spent a month or more resolving problems."[19] In fact, the BJS reported, "resolving the problems caused by identity theft [could] take more than a year for some victims."[20]

104.    As the fraudulent activity resulting from the Data Breach may not come to light for years, Plaintiffs and Class Members now face years of constant surveillance of their financial and personal records, monitoring, and loss of rights. The Class is incurring and will continue to incur such damages in addition to any fraudulent use of their Private Information.

105.    This readily available and accessible information confirms that, prior to the Data breach, Defendant knew or should have known that (i) ransomware actors were targeting entities such as Defendant, (ii) ransomware gangs were ferociously aggressive in their pursuit of entities such as Defendant, (iii) ransomware gangs were leaking corporate information on dark web portals, and (iv) ransomware tactics included threatening to release stolen data.

106.    Before the Data Breach, Defendant knew or should have known that there was a foreseeable risk that Plaintiffs' and Class Members' Private Information could be accessed,

---

[19] Erika Harrell, *Victims of Identity Theft, 2014*, U.S. DEP'T OF JUSTICE (Sept. 2015), https://bjs.ojp.gov/content/pub/pdf/vit14.pdf (revised Nov. 13, 2017).
[20] *Id.*

Case 7:26-cv-00032-BO-RN    Document 4    Filed 02/23/26    Page 21 of 126

exfiltrated, and published as a result of a cyberattack. Notably, data breaches are prevalent in today's society therefore making the risk of experiencing a data breach entirely foreseeable to Defendant.

107. Defendant knew or should have known that it should have encrypted its patients' Social Security numbers and other sensitive data elements within the Private Information to protect against their publication and misuse in the event of a cyberattack.

***Defendant Could Have Prevented the Data Breach***

108. Data breaches are preventable. Indeed, the American Bar Association published a treatise titled the *Data Breach and Encryption Handbook* wherein the author explained as follows:

a. "In almost all cases, the data breaches that occurred could have been prevented by proper planning and the correct design and implementation of appropriate security solutions," and

b. "Organizations that collect, use, store, and share sensitive personal data must accept responsibility for protecting the information and ensuring that it is not compromised," and

c. "Most of the reported data breaches are a result of lax security and the failure to create or enforce appropriate security policies, rules, and procedures . . . . Appropriate information security controls, including encryption, must be implemented and enforced in a rigorous and disciplined manner so that a data breach never occurs."[21]

***Defendant Failed to Comply with FTC Rules.***

---

[21] Lucy L. Thomson, *Despite the Alarming Trends, Data Breaches Are Preventable*, DATA BREACH & ENCRYPTION HANDBOOK (2012)..

109. The Federal Trade Commission ("FTC") has promulgated numerous guides for businesses which highlight the importance of implementing reasonable data security practices. According to the FTC, the need for data security should be factored into all business decision-making.

110. In 2016, the FTC updated its publication, *Protecting Personal Information: A Guide for Business*, which established cyber-security guidelines for businesses. The guidelines note that businesses should protect the personal patient information that they keep; properly dispose of personal information that is no longer needed; encrypt information stored on computer networks; understand their network's vulnerabilities; and implement policies to correct any security problems.[22]

111. The guidelines also recommend that businesses use an intrusion detection system to expose a breach as soon as it occurs; monitor all incoming traffic for activity indicating someone is attempting to hack the system; watch for large amounts of data being transmitted from the system; and have a response plan ready in the event of a breach.

112. The FTC further recommends that companies not maintain Private Information longer than is needed for authorization of a transaction; limit access to sensitive data; require complex passwords to be used on networks; use industry-tested methods for security; monitor for suspicious activity on the network; and verify that third-party service providers have implemented reasonable security measures.

113. The FTC has brought enforcement actions against businesses for failing to adequately and reasonably protect patient data, treating the failure to employ reasonable and

---

[22] *Protecting Personal Information: A Guide for Business*, FED. TRADE COMM'N (Oct. 2016), https://www.ftc.gov/system/files/documents/plain-language/pdf-0136_proteting-personal-information.pdf.

appropriate measures to protect against unauthorized access to confidential consumer data as an unfair act or practice prohibited by Section 5 of the FTC Act, 15 U.S.C. § 45. Orders resulting from these actions clarify the measures businesses take to meet their data security obligations.

114.    The FTC enforcement actions include actions against healthcare entities like Defendant. *See, e.g., In the Matter of LabMD, Inc., a coprp*, 2016-2 Trade Cas. (CCH) ¶ 79708, 2016 WL 4128215, at *32 (MSNET July 28, 2016) ("[T]he Commission concludes that LabMD's data security practices were unreasonable and constitute an unfair act or practice in violation of Section 5 of the FTC Act.").

115.    Defendant failed to properly implement basic data security practices. Defendant's failure to employ reasonable and appropriate measures to protect against unauthorized access to Plaintiffs' and Class Members' Private Information constitutes an unfair act or practice prohibited by section 5 of the FTC Act, 15 U.S.C. § 45.

***Defendant Violated HIPAA.***

116.    Defendant is a covered business under HIPAA, 45 C.F.R. § 160.102 and is required to comply with the HIPAA Privacy Rule and Security Rule, 45 C.F.R. Part 160 and Part 164, Subparts A and E ("Standards for Privacy of Individually Identifiable Health Information"), and Security Rule ("Security Standards for the Protection of Electronic Protected Health Information"), 45 C.F.R. Part 160 and Part 164, Subparts A and C.

117.    Defendant is subject to the rules and regulations for safeguarding electronic forms of medical information pursuant to the Health Information Technology Act ("HITECH")[23]

---

[23] HIPAA and HITECH work in tandem to provide guideline and rules for maintaining protected health information, HITECH references and incorporates HIPAA.

118.     HIPAA circumscribes security provisions and data privacy responsibilities designed to keep patients' medical information safe. HIPAA compliance provisions, commonly known as the Administrative Simplification Rules, establish national standards for electronic transactions and code sets to maintain the privacy and security of protected health information.[24]

119.     HIPAA provides specific privacy rules that require comprehensive administrative, physical, and technical safeguards to ensure the confidentiality, integrity, and security of Private Information is properly maintained.[25]

120.     The Data Breach itself resulted from a combination of inadequacies showing Defendant failed to comply with safeguards mandated by HIPAA. Defendant's security failures include, but are not limited to:

a.   Failing to ensure the confidentiality and integrity of electronic PHI that it creates, receives, maintains, and transmits in violation of 45 C.F.R. § 164.306(a)(1);

b.   Failing to protect against any reasonably-anticipated threats or hazards to the security or integrity of electronic PHI in violation of 45 C.F.R. § 164.306(a)(2);

c.   Failing to protect against any reasonably anticipated uses or disclosures of electronic PHI that are not permitted under the privacy rules regarding individually identifiable health information in violation of 45 C.F.R. § 164.306(a)(3);

d.   Failing to ensure compliance with HIPAA security standards by Defendant's workforce in violation of 45 C.F.R. § 164.306(a)(4);

---

[24] HIPAA lists 18 types of information that qualify as PHI according to guidance from the Department of Health and Human Services Office for Civil Rights, and includes, *inter alia*: names, addresses, any dates including dates of birth, Social Security numbers, and medical record numbers.
[25] *See* 45 C.F.R. § 164.306 (security standards and general rules); 45 C.F.R. § 164.308 (administrative safeguards); 45 C.F.R. § 164.310 (physical safeguards); 45 C.F.R. § 164.312 (technical safeguards).

e.  Failing to implement technical policies and procedures for electronic information systems that maintain electronic PHI to allow access only to those persons or software programs that have been granted access rights in violation of 45 C.F.R. § 164.312(a)(1);

f.  Failing to implement policies and procedures to prevent, detect, contain, and correct security violations in violation of 45 C.F.R. § 164.308(a)(1);

g.  Failing to identify and respond to suspected or known security incidents and failing to mitigate, to the extent practicable, harmful effects of security incidents that are known to the covered entity in violation of 45 C.F.R. § 164.308(a)(6)(ii);

h.  Failing to effectively train all staff members on the policies and procedures with respect to PHI as necessary and appropriate for staff members to carry out their functions and to maintain security of PHI in violation of 45 C.F.R. § 164.530(b) and 45 C.F.R. § 164.308(a)(5); and

i.  Failing to design, implement, and enforce policies and procedures establishing physical and administrative safeguards to reasonably safeguard PHI, in compliance with 45 C.F.R. § 164.530(c).

121.  Simply put, the Data Breach resulted from a combination of insufficiencies demonstrating that Defendant failed to comply with safeguards mandated by HIPAA regulations.

***Defendant Failed to Comply with Industry Standards.***

122.  As shown above, experts studying cybersecurity routinely identify healthcare providers as being particularly vulnerable to cyberattacks because of the value of the Private Information which they collect and maintain.

123.   To prevent and detect unauthorized cyber-attacks, Defendant could and should have implemented, as recommended by the United States Government, the following measures:

- Implement an awareness and training program. Because end users are targets, employees and individuals should be aware of the threat of ransomware and how it is delivered.

- Enable strong spam filters to prevent phishing emails from reaching the end users and authenticate inbound email using technologies like Sender Policy Framework (SPF), Domain Message Authentication Reporting and Conformance (DMARC), and DomainKeys Identified Mail (DKIM) to prevent email spoofing.

- Scan all incoming and outgoing emails to detect threats and filter executable files from reaching end users.

- Configure firewalls to block access to known malicious IP addresses.

- Patch operating systems, software, and firmware on devices. Consider using a centralized patch management system.

- Set anti-virus and anti-malware programs to conduct regular scans automatically.

- Manage the use of privileged accounts based on the principle of least privilege: no users should be assigned administrative access unless absolutely needed; and those with a need for administrator accounts should only use them when necessary.

- Configure access controls—including file, directory, and network share permissions—with at least privilege in mind. If a user only needs to read specific files, the user should not have written access to those files, directories, or shares.

- Disable macro scripts from office files transmitted via email. Consider using Office Viewer software to open Microsoft Office files transmitted via email instead of full office suite applications.

- Implement Software Restriction Policies (SRP) or other controls to prevent programs from executing from common ransomware locations, such as temporary folders supporting popular Internet browsers or compression/decompression programs, including the AppData/LocalAppData folder.

- Consider disabling Remote Desktop protocol (RDP) if it is not being used.

- Use application whitelisting, which only allows systems to execute programs known and permitted by security policy.

- Execute operating system environments or specific programs in a virtualized

27

environment

- Categorize data based on organizational value and implement physical and logical separation of networks and data for different organizational units.[26]

124. To prevent and detect cyber-attacks, including the cyber-attack that resulted in the Data Breach, Defendant could and should have implemented, as recommended by the United States Cybersecurity & Infrastructure Security Agency, the following measures:

- **Update and patch your computer**. Ensure your applications and operating systems (OSs) have been updated with the latest patches. Vulnerable applications and OSs are the target of most ransomware attacks….

- **Use caution with links and when entering website addresses**. Be careful when clicking directly on links in emails, even if the sender appears to be someone you know. Attempt to independently verify website addresses (e.g., contact your organization's helpdesk, search the Internet for the sender organization's website or the topic mentioned in the email). Pay attention to the website addresses you click on, as well as those you enter yourself. Malicious website addresses often appear almost identical to legitimate sites, often using a slight variation in spelling or a different domain (e.g., .com instead of .net) . . . .

- **Open email attachments with caution**. Be wary of opening email attachments, even from senders you think you know, particularly when attachments are compressed files or ZIP files.

- **Keep your personal information safe**. Check a website's security to ensure the information you submit is encrypted before you provide it. . . .

- **Verify email senders**. If you are unsure whether or not an email is legitimate, try to verify the email's legitimacy by contacting the sender directly. Do not click on any links in the email. If possible, use a previous (legitimate) email to ensure the contact information you have for the sender is authentic before you contact them.

- **Inform yourself**. Keep yourself informed about recent cybersecurity threats and up to date on ransomware techniques. You can find information about known phishing attacks on the Anti-Phishing Working Group website. You may also want to sign up for CISA product notifications, which will alert you when a new Alert, Analysis Report, Bulletin, Current Activity, or Tip has been published.

---

[26] HOW TO PROTECT YOUR NETWORKS FROM RANSOMWARE 3–4, FBI, https://www.fbi.gov/file-repository/ransomware-prevention-and-response-for-cisos.pdf/view (U.S. Government Interagency technical guidance document) (last visited Dec. 12, 2025).

- **Use and maintain preventative software programs**. Install antivirus software, firewalls, and email filters—and keep them updated—to reduce malicious network traffic. . . .[27]

125. To prevent and detect cyber-attacks, including the cyber-attack that resulted in the Data Breach, Defendant could and should have implemented, as recommended by the Microsoft Threat Protection Intelligence Team, the following measures:

**Secure Internet-facing assets**

- Apply latest security updates
- Use threat and vulnerability management
- Perform regular audit; remove privileged credentials;

**Thoroughly investigate and remediate alerts**
- Prioritize and treat commodity malware infections as potential full compromise;

**Include IT Pros in security discussions**
- Ensure collaboration among [security operations], [security admins], and [information technology] admins to configure servers and other endpoints securely;

**Build credential hygiene**
- Use [multifactor authentication] or [network level authentication] and use strong, randomized, just-in-time local admin passwords

**Apply principle of least-privilege**
- Monitor for adversarial activities
- Hunt for brute force attempts
- Monitor for cleanup of Event Logs
- Analyze logon events

**Harden infrastructure**
- Use Windows Defender Firewall
- Enable tamper protection
- Enable cloud-delivered protection
- Turn on attack surface reduction rules and [Antimalware Scan Interface] for Office [Visual Basic for Applications].[28]

---

[27] *Protecting Against Ransomware*, CYBERSECURITY & INFRASTRUCTURE SEC. AGENCY (April 11, 2019), https://www.cisa.gov/news-events/news/protecting-against-ransomware (revised Sept. 2, 2021).
[28] *Human-Operated Ransomware Attacks: A Preventable Disaster*, MICROSOFT THREAT INTELLIGENCE (Mar. 5, 2020), https://www.microsoft.com/security/blog/2020/03/05/human-operated-ransomware-attacks-a-preventable-disaster.

126. Given that Defendant was storing the Private Information of Plaintiffs and Class Members, Defendant could and should have implemented all of the above measures to prevent and detect cyberattacks.

127. Defendant failed to meet the minimum standards of any of the following frameworks: the NIST Cybersecurity Framework Version 2.0 (including without limitation PR.AA-01, PR.AA.-02, PR.AA-03, PR.AA-04, PR.AA-05, PR.AT-01, PR.DS-01, PR-DS-02, PR.DS-10, PR.PS-01, PR.PS-02, PR.PS-05, PR.IR-01, DE.CM-01, DE.CM-03, DE.CM-06, DE.CM-09, and RS.CO-04), and the Center for Internet Security's Critical Security Controls (CIS CSC), which are all established standards in reasonable cybersecurity readiness.

128. The foregoing frameworks are existing and applicable industry standards in the healthcare industry, and Defendant failed to comply with these accepted standards, thereby opening the door to and causing the Data Breach.

***The Data Breach Injured Plaintiffs and Class Members***

129. Plaintiffs and members of the proposed Class have suffered injuries and damages from the unauthorized disclosure and misuse of their Private Information disclosed in the Data Breach that can be directly traced to Defendant, that has occurred, is ongoing, and/or will imminently occur.

130. Data Breaches such as the one experienced by Plaintiffs and Class Members are especially problematic because of the disruption they cause to the daily lives of victims affected by the attack.

131. As stated prior, on information and belief, in the Data Breach, cybercriminals were able to access the Plaintiffs' and the proposed Class Members' Private Information, which is now

being used or will imminently be used for fraudulent purposes and/or has been sold for such purposes and posted on the dark web for sale, causing widespread injury and damages.

132. Once an individual's Private Information is for sale and access on the dark web, cybercriminals can use the stolen and compromised to gather and steal even more information.[29]

133. The ramifications of Defendant's failure to keep Plaintiffs' and the Class's Private Information secure are severe. Identity theft occurs when someone uses another's personal and financial information such as that person's name, account number, Social Security number, driver's license number, date of birth, or other information, such as addresses, without permission, to commit fraud or other crimes.

134. Because Defendant failed to prevent the Data Breach, Plaintiffs and the proposed Class Members have suffered, will imminently suffer, and will continue to suffer injury-in-fact and damages, including but not limited to the following:

a. The loss of the opportunity to control how Private Information is used;

b. Unauthorized use of stolen Private Information;

c. Dramatic increase in spam telephone calls;

d. Emotional distress;

e. The compromise and continuing publication of their Private Information;

f. Out-of-pocket expenses associated with the prevention, detection, recovery, and remediation from identity theft or fraud, and for necessary credit monitoring and identity theft protection;

---

[29] Ryan Toohil, *What do Hackers do with Stolen Information*, AURA, (September 5, 2023) https://www.aura.com/learn/what-do-hackers-do-with-stolen-information.

g. Lost opportunity costs and lost wages associated with the time and effort expended addressing and trying to mitigate the actual and future consequences of the Data Breach, including, but not limited to, efforts spent researching how to prevent, detect, contest, and recover from identity theft and fraud;

h. The diminution in value of their Private Information; and,

i. The continued risk to their Private Information, which remains in the possession of Defendant and is subject to further breaches so long as Defendant fails to undertake the appropriate measures to protect the Private Information in its possession.

***The Data Breach Caused Plaintiffs and the Class an Imminent Risk of Identity Theft***

135. Furthermore, the Data Breach has placed Plaintiffs and the proposed Class Members at an increased and imminent risk of fraud and identity theft.

136. Plaintiffs and Class Members are at a heightened risk of identity theft for years to come, especially because Defendant's failures resulted in Plaintiffs' and Class Members' Private Information falling into the hands of identity thieves.

137. The unencrypted Private Information of Class Members has already or will end up for sale on the dark web, because that is the *modus operandi* of hackers. Indeed, when these criminals do not post the data to the dark web, it is usually at least sold on private Telegram channels to even further identity thieves who purchase the Private Information for the express purpose of conducting financial fraud and identity theft operations.

138. Private Information is of high value to criminals, as evidenced by the prices they will pay through the dark web. Numerous sources cite dark web pricing for stolen identity credentials. For example, Private Information can be sold at a price ranging from $40 to $200, and bank details have a price range of $50 to $200. Experian reports that a stolen credit or debit card

number can sell for $5 to $110 on the dark web. Criminals can also purchase access to entire company data breaches from $900 to $4,500.

139.    Based on the foregoing, the information compromised in the Data Breach is significantly more valuable than the loss of, for example, credit card information in a retailer data breach because, there, victims can cancel or close credit and debit card accounts.

140.    This data demands a much higher price on the black market. Martin Walter, senior director at cybersecurity firm RedSeal, explained, "Compared to credit card information, personally identifiable information . . . [is] worth more than 10x on the black market."[30]

141.    Among other forms of fraud, identity thieves may obtain driver's licenses, government benefits, medical services, and housing or even give false information to police.

142.    Because a person's identity is akin to a puzzle with multiple data points, the more accurate pieces of data an identity thief obtains about a person, the easier it is for them to take on the victim's identity, or to track the victim to attempt other hacking crimes against the individual to obtain more data to perfect a crime.

143.    For example, armed with just a name and date of birth, a data thief can utilize a hacking technique referred to as "social engineering" to obtain even more information about a victim's identity, such as a person's login credentials or Social Security number. Social engineering is a form of hacking whereby a data thief uses previously acquired information to manipulate and trick individuals into disclosing additional confidential or personal information through means

---

[30] Tim Greene, *Anthem Hack: Personal Data Stolen Sells for 10X Price of Stolen Credit Card Numbers*, (Feb. 6, 2015), https://www.networkworld.com/article/2880366/anthem-hack-personal-data-stolen-sells-for-10x-price-of-stolen-credit-card-numbers.html.

such as spam phone calls and text messages or phishing emails. Data breaches are often the starting point for these additional targeted attacks on the victims.

144.    Identity thieves can also use an individual's personal data and Private Information to obtain a driver's license or official identification card in the victim's name but with the thief's picture; use the victim's name and Social Security number to obtain government benefits; or file a fraudulent tax return using the victim's information. In addition, identity thieves may obtain a job using the victim's information, rent a house or receive medical services in the victim's name, and may even give the victim's personal information to police during an arrest resulting in an arrest warrant issued in the victim's name.

145.    Further, the standard operating procedure for cybercriminals is to use some data, like the Private Information here, to access "Fullz" packages of that person to gain access to the full suite of additional Private Information that those cybercriminals have access through other means. Using this technique, identity thieves piece together full pictures of victims' information to perpetrate even more types of attacks.

146.    With Fullz packages, cybercriminals can cross-reference two sources of Private Information to marry unregulated data available elsewhere to criminally stolen data with an astonishingly complete scope and degree of accuracy to assemble complete dossiers on individuals.

147.    The development of Fullz packages means here that the stolen Private Information from the Data Breach can easily be used to link and identify it to Plaintiffs' and Class Members' phone numbers, email addresses, and other unregulated sources and identifiers. In other words, even if certain information such as emails, phone numbers, or credit card numbers may not be included in the Private Information that was exfiltrated in the Data Breach, criminals may still

easily create a Fullz package and sell it at a higher price to unscrupulous operators and criminals (such as illegal and scam telemarketers) over and over.

148.    Further, as discussed above, the standard operating procedure for cybercriminals is to use some data, like the Private Information here, to access Fullz packages of that person to gain access to the full suite of additional Private Information that those cybercriminals have access through other means. Using this technique, identity thieves piece together full pictures of victims' information to perpetrate even more types of attacks.

149.    There are myriad dangers which affect victims of identity theft, including: cybercriminals opening new financial accounts, credit cards, and loans in victims' names; victims losing health care benefits (medical identity theft); hackers taking over email and other accounts; time and effort to repair credit scores; losing homes due to mortgage and deed fraud; theft of tax refunds; hackers posting embarrassing posts on victim's social media accounts; victims spending large amounts of time and money to recover their identities; experiencing psychological harm and emotional distress; victims becoming further victimized by repeat instances of identity theft and fraud; cybercriminals committing crimes in victim's names; victims' personal data circulating the dark web forever; and victims receiving increased spam telephone calls and emails; victims' children or elderly parents having their identities stolen.

150.    Individuals, like Plaintiffs and Class Members, are particularly concerned with protecting the privacy of their Social Security numbers, which are the key to stealing any person's identity and is likened to accessing DNA for hackers' purposes.

151.    According to the Social Security Administration, each time an individual's Social Security number is compromised, "the potential for a thief to illegitimately gain access to bank accounts, credit cards, driving records, tax and employment histories and other private information

increases."[31] Moreover, "[b]ecause many organizations still use SSNs as the primary identifier, exposure to identity theft and fraud remains."[32]

152. The Social Security Administration stresses that the loss of an individual's Social Security number, as experienced by Plaintiffs and some Class Members, can lead to identity theft and extensive financial fraud:

> A dishonest person who has your Social Security number can use it to get other personal information about you. Identity thieves can use your number and your good credit to apply for more credit in your name. Then, they use the credit cards and don't pay the bills, it damages your credit. You may not find out that someone is using your number until you're turned down for credit, or you begin to get calls from unknown creditors demanding payment for items you never bought. Someone illegally using your Social Security number and assuming your identity can cause a lot of problems.[33]

153. In fact, "[a] stolen Social Security number is one of the leading causes of identity theft and can threaten your financial health."[34] "Someone who has your SSN can use it to impersonate you, obtain credit and open bank accounts, apply for jobs, steal your tax refunds, get medical treatment, and steal your government benefits."[35]

154. Identity thieves may obtain a job using the victim's Social Security number, rent a house or receive medical services in the victim's name, and may even give the victim's Private Information to police during an arrest—resulting in an arrest warrant being issued in the victim's

---

[31] *See Avoid Identity Theft*, SOC. SEC. ADMIN., https://www.ssa.gov/phila/ProtectingSSNs.htm#:~:text=An%20organization's%20collection%20and%20use,and%20other%20private%20information%20increases (last visited Dec. 12, 2025).
[32] *Id.*
[33] *Identity Theft and Your Social Security Number*, SOC. SEC. ADMIN. (Oct. 2024), https://www.ssa.gov/pubs/EN-05-10064.pdf.
[34] *See How to Protect Yourself from Social Security Number Identity Theft*, EQUIFAX, https://www.equifax.com/personal/education/identity-theft/articles/-/learn/social-security-number-identity-theft/ (last visited Dec. 12, 2025).
[35] *See* Julia Kagan, *What is a SSN? What to Know About Social Security Numbers*, INVESTOPEDIA (Sept. 2, 2024) https://www.investopedia.com/terms/s/ssn.asp.

name. That can be even more problematic and difficult to remedy for someone who already has a criminal record.

155.     Such fraud may go undetected until debt collection calls commence months, or even years later. Stolen Social Security numbers also make it possible for thieves to file fraudulent tax returns, file for unemployment benefits, or apply for a job using a false identity. Each of these fraudulent activities is difficult to detect. An individual may not know that his or her Social Security Number was used to file for unemployment benefits until law enforcement notifies the individual's employer of the suspected fraud. Fraudulent tax returns are typically discovered only when an individual's authentic tax return is rejected.

156.     Data Breach victims suffer long-term consequences when their Social Security numbers are taken and used by hackers. Even if they know their Social Security numbers are being misused, Plaintiffs and Class Members cannot obtain new numbers unless they become a victim of Social Security number misuse.

157.     It is no easy task to change or cancel a stolen Social Security number. An individual cannot obtain a new Social Security number without significant paperwork and evidence of actual misuse. In other words, preventive action to defend against the possibility of misuse of a Social Security number is not permitted; an individual must show evidence of actual, ongoing fraud activity to obtain a new number.

158.     Even then, a new Social Security number may not be effective. According to Julie Ferguson of the Identity Theft Resource Center, "[t]he credit bureaus and banks are able to link

the new number very quickly to the old number, so all of that old bad information is quickly inherited into the new Social Security number."[36]

159.    Similarly, the Social Security Administration has warned as follows:

[A] new number probably won't solve all your problems. This is because other governmental agencies (such as the IRS and state motor vehicle agencies) and private businesses (such as banks and credit reporting companies) will have records under your old number. Along with other personal information, credit reporting companies use the number to identify your credit record. So, using a new number won't guarantee you a fresh start. This is especially true if your other PII, such as your name and address, remains the same.[37]

160.    The California state government warns, "Originally, your Social Security number (SSN) was a way for the government to track your earnings and pay you retirement benefits. But over the years, it has become much more than that. It is the key to a lot of your personal information. With your name and SSN, an identity thief could open new credit and bank accounts, rent an apartment, or even get a job."[38]

161.    The FTC recommends identity theft victims take several costly steps to protect their personal and financial information after a data breach, including contacting one of the credit bureaus to place a fraud alert (consider an extended fraud alert that lasts for 7 years if someone steals their identity), reviewing their credit reports, contacting companies to remove fraudulent charges from their accounts, seeking a credit freeze, and correcting their credit reports.

162.    Theft of PHI is also gravely serious: "A thief may use your name or health insurance numbers to see a doctor, get prescription drugs, file claims with your insurance provider, or get

---

[36] Bryan Naylor, *Victims of Social Security Number Theft Find It's Hard to Bounce Back*, NPR (Feb. 9, 2015),                          http://www.npr.org/2015/02/09/384875839/data-stolen-by-anthem-s-hackers-has-millionsworrying-about-identity-theft.
[37] *Identity Theft and Your Social Security Number*, Pub. No. 05-10064, SOCIAL SEC. ADMIN. (July 2021), https://www.ssa.gov/pubs/EN-05-10064.pdf.
[38] *See Your Social Security Number: Controlling the Key to Identity Theft*, CAL. DEPT. JUST. https://oag.ca.gov/idtheft/facts/your-ssn (last visited Dec. 12, 2025).

other care. If the thief's health information is mixed with yours, your treatment, insurance and payment records, and credit report may be affected."[39] Drug manufacturers, medical device manufacturers, pharmacies, hospitals and other healthcare service providers often purchase Private Information on the black market for the purpose of target marketing their products and services to the physical maladies of the data breach victims themselves. Insurance companies purchase and use wrongfully disclosed PHI to adjust their insureds' medical insurance premiums.

163.    Further, according to the Identity Theft Resource Center's 2021 Consumer Aftermath Report, identity theft victims suffer "staggering" emotional tolls. For example, nearly 30% of victims have been the victim of a previous identity crime; an all-time high number of victims say they have contemplated suicide. Moreover, thirty-three percent reported not having enough money to pay for food and utilities, while 14% were evicted because they couldn't pay rent or their mortgage. Fifty-four percent reported feelings of being violated.[40]

164.    What's more, theft of Private Information is also gravely serious outside of the traditional risks of identity theft. In the last two decades, as more and more of our lives become interconnected through the lens of massively complex cloud computing, Private Information are valuable property rights.

165.    Private Information is such a valuable commodity to identity thieves that once the information has been compromised, criminals often trade the information on the dark web, aka the cyber black-market, for years.

---

[39] *See Medical Identity Theft*, FTC, http://www.consumer.ftc.gov/articles/0171-medical-identity-theft (last visited Dec. 12, 2025).
[40] *The Identity Theft Resource Center's 2021 Consumer Aftermath Report Reveals Impacts on Covid-19 Identit Crime Victims*, IDENTITY THEFT RES. CTR. (May, 26, 2021), https://www.idtheftcenter.org/post/the-identity-theft-resource-centers-2021-consumer-aftermath-report-reveals-impacts-on-covid-19-identity-crime-victims/.

166.    Where the most Private Information belonging to Plaintiffs and Class Members was accessible from Defendant's network and BianLian has already posted the Data Breach on its dark web leak site, it is almost certain that entire batches of stolen information have been dumped on the black market and are yet to be dumped on the black market, meaning Plaintiffs and the Class Members are at an increased risk of fraud and identity theft for many years into the future.

167.    Further, there may be a substantial time lag—measured in years—between when harm occurs versus when it is discovered, and between when Private Information and/or financial information is stolen and when it is used. According to the U.S. Government Accountability Office, which studied data breaches:

> [L]aw enforcement officials told us that in some cases, stolen data may be held for up to a year or more before being used to commit identity theft. Further, once stolen data have been sold or posted on the Web, fraudulent use of that information may continue for years. As a result, studies that attempt to measure the harm resulting from data breaches cannot necessarily rule out all future harm.[41]

168.    Thus, Plaintiffs and the Class Members must vigilantly monitor their financial and credit accounts for many years to come.

169.    Accordingly, the Data Breach has caused Plaintiffs and the proposed Class Members a greatly increased risk of identity theft and fraud, in addition to the other injuries and damages set forth herein.

170.    Defendant knew or should have known of these harms which would be caused by the Data Breach they permitted to occur and strengthened its data systems accordingly.

***Loss of Time to Mitigate Risk of Identity Theft and Fraud***

---

[41] *See* GAO Report, at p. 29.

171.     Because of the recognized risk of identity theft, when a data breach occurs, and an individual is notified by a company that his or her Private Information was compromised, as in this Data Breach, the reasonable person is expected to take steps and spend time to address the dangerous situation, learn about the breach, and otherwise mitigate the risk of becoming a victim of identity theft of fraud. Failure to spend time taking steps to review accounts or credit reports could expose the individual to greater financial harm and Defendant arguing that the individual failed to mitigate damages.

172.     The need to spend time mitigating the risk of harm is especially important in cases like this where Plaintiffs' and Class Members' Social Security numbers or other government identification are affected.

173.     By spending this time, Plaintiffs were not manufacturing their own harm, they were taking necessary steps at Defendant's direction and because the Data Breach included their Social Security numbers.

174.     Plaintiffs and Class Members have spent, and will spend additional time in the future, on a variety of prudent actions to remedy the harms they have or may experience because of the Data Breach, such as contacting credit bureaus to place freezes on their accounts; changing passwords and re-securing their own computer networks; and checking their financial accounts for any indication of fraudulent activity, which may take years to detect.

175.    These efforts are consistent with the GAO Report on data breaches noting that victims of identity theft will face "substantial costs and time to repair the damage to her good name and credit record."[42]

**Diminution in Value of Private Information**

176.    PII and PHI are valuable property rights. Their value is axiomatic, considering the value of Big Data in corporate America, and the consequences of cyber thefts include heavy prison sentences. Even this obvious risk-to-reward analysis illustrates beyond doubt that Private Information has considerable market value.

177.    An active and robust legitimate marketplace for Private Information exists. In 2019, the data brokering industry was worth roughly $200 billion.

178.    In fact, the data marketplace is so sophisticated that consumers can actually sell their non-public information directly to a data broker who in turn aggregates the information and provides it to marketers or app developers.

179.    Consumers who agree to provide their web browsing history to the Nielsen Corporation can receive up to $50.00 a year.

180.    Conversely, sensitive PII can sell for as much as $363 per record on the dark web according to the Infosec Institute.

181.    As a result of the Data Breach, Plaintiffs' and Class Members' Private Information, which has an inherent market value in both legitimate and dark markets, has been damaged and diminished by its compromise and unauthorized release. However, this transfer of value occurred

---

[42] See GAO-07-737, *Personal Information: Data Breaches Are Frequent, but Evidence of Resulting Identity Theft Is Limited; However, the Full Extent Is Unknown*, U.S. GOV'T OFFICE, (June 2007), https://www.gao.gov/new.items/d07737.pdf.

without any consideration paid to Plaintiffs or Class Members for their property, resulting in an economic loss. Moreover, Private Information is now readily available, and the rarity of the Data has been lost, thereby causing additional loss of value.

***The Future Cost of Credit and Identity Theft Monitoring Is Reasonable and Necessary***

182.    Based on the value of the information stolen, the data either has or will be sold to cybercriminals whose mission it is to perpetrate identity theft and fraud. Even if the data is not posted online, these data are ordinarily sold and transferred through private Telegram channels wherein thousands of cybercriminals participate in a market for such data so that they can misuse it and earn money from financial fraud and identity theft of data breach victims.

183.    Such fraud may go undetected for years; consequently, Plaintiffs and Class Members are at a present and continuous risk of fraud and identity theft for many years into the future.

184.    The retail cost of credit monitoring and identity theft monitoring can cost $200 or more per year per Class Member. This is a reasonable and necessary cost to monitor and protect Class Members from the risk of identity theft that arose from the Data Breach. This is a future cost for a minimum of seven years that Plaintiffs and Class Members would not need to bear but for Defendant's failure to safeguard their Private Information.

***Loss of Benefit of the Bargain***

185.    Furthermore, Defendant's poor data security deprived Plaintiffs and Class Members of the benefit of their bargain. When agreeing to provide Defendant with their Private Information under certain terms, Plaintiffs and Class Members understood and expected that Defendant would properly safeguard and protect their Private Information, when in fact, Defendant did not provide the expected data security. Accordingly, Plaintiffs and Class Members received medical services

of a lesser value than what they reasonably expected to receive under the bargains they struck with Defendant.

**Plaintiffs' Experiences and Injuries**

**Plaintiff Jamica Bass's Experience**

186.    Plaintiff Bass is a current patient of Defendant and is a data breach victim. As a condition of treatment as a patient with Defendant, Plaintiff Bass provided Defendant with her Private Information, which was used to facilitate treatment of Plaintiff. Defendant required Plaintiff Bass to provide that Private Information to obtain treatment and care.

187.    Plaintiff Bass received a Notice Letter from Defendant on or around September 17, 2025, informing her that her Private Information was exposed in Defendant's Data Breach. *See* Ex. A.

188.    Defendant deprived Plaintiff Bass of the earliest opportunity to guard herself against the Data Breach's effects by failing to promptly notify her.

189.    As a result of its inadequate cybersecurity, Defendant exposed Plaintiff Bass's Private Information for theft by cybercriminals and sale on the dark web.

190.    As a result of the Data Breach, Plaintiff Bass spent time dealing with the consequences of the Data Breach, which includes consistently monitoring her financial accounts a few times a week to ensure no fraudulent activity has occurred. Additionally, Plaintiff Bass has spent time communicating and complying with counsel in this matter. This time has been lost forever and cannot be recaptured.

191.    Plaintiff Bass has and will spend considerable time and effort monitoring her accounts to protect herself from additional identity theft. Plaintiff Bass fears for her personal financial security and uncertainty over what Private Information was exposed in the Data Breach.

192.     Plaintiff Bass has and is experiencing feelings of anxiety, stress, fear, and frustration because of the Data Breach. This goes far beyond allegations of mere worry or inconvenience; it is exactly the sort of injury and harm to a Data Breach victim that the law contemplates and addresses.

193.     Plaintiff Bass has suffered actual injury in the form of damages to and diminution in the value of her Private Information—a form of intangible property that Plaintiff entrusted to Defendant, which was compromised in and as a result of the Data Breach.

194.     Plaintiff Bass suffered actual injury from the exposure of her Private Information, which violates her rights to privacy.

195.     Plaintiff Bass has suffered imminent and impending injury arising from the substantially increased risk of fraud, identity theft, and misuse resulting from her Private Information being placed in the hands of unauthorized third parties and possibly criminals.

196.     Following the Data Breach, when Plaintiff Bass was filling out her 2025 tax return, Plaintiff had to do additional identity checks and amend her tax documents because her identity was not able to be verified and it was possible someone started a false return in her name.

197.     Once an individual's Private Information is for sale and access on the dark web, as Plaintiff Bass's Private Information is here as a result of the Breach, cybercriminals are able to use the stolen and compromised to gather and steal even more information.[43] Upon information and belief, Plaintiff Bass's name, address, date of birth, Social Security number, driver's license number, and medical record number were all compromised as a result of the Data Breach, *see* Ex.

---

[43] *What do Hackers Do with Stolen Information?*, AURA (Sept. 5, 2023), https://www.aura.com/learn/what-do-hackers-do-with-stolen-information.

A – which is certainly a sufficient breadth of information to be able to begin harassing Plaintiff through spam communications in attempts to extract more information from her.

198.    Plaintiff Bass has a continuing interest in ensuring that her Private Information, which, upon information and belief, remains backed up in Defendant's possession, is protected, and is safeguarded from future breaches.

### *Plaintiff Ruth Brunick's Experience*

199.    Plaintiff Brunick was patient of Defendant and is a data breach victim. As a condition of treatment as a patient with Defendant, Plaintiff Brunick provided Defendant with her Private Information, which was used to facilitate treatment of Plaintiff. Defendant required Plaintiff Brunick to provide that Private Information to obtain treatment and care.

200.    Defendant deprived Plaintiff Bass of the earliest opportunity to guard herself against the Data Breach's effects by failing to promptly notify her.

201.    As a result of its inadequate cybersecurity, Defendant exposed Plaintiff Brunick's Private Information for theft by cybercriminals and sale on the dark web.

202.    As a result of the Data Breach, Plaintiff Brunick spent time dealing with the consequences of the Data Breach, which includes consistently monitoring her financial accounts a few times a week to ensure no fraudulent activity has occurred. Additionally, Plaintiff Brunick has spent time communicating and complying with counsel in this matter. This time has been lost forever and cannot be recaptured.

203.    Plaintiff Brunick has and will spend considerable time and effort monitoring her accounts to protect herself from additional identity theft. Plaintiff Brunick fears for her personal financial security and uncertainty over what Private Information was exposed in the Data Breach.

204. Plaintiff Brunick has and is experiencing feelings of anxiety, stress, fear, and frustration because of the Data Breach. This goes far beyond allegations of mere worry or inconvenience; it is exactly the sort of injury and harm to a Data Breach victim that the law contemplates and addresses.

205. Plaintiff Brunick has suffered actual injury in the form of damages to and diminution in the value of her Private Information—a form of intangible property that Plaintiff entrusted to Defendant, which was compromised in and as a result of the Data Breach.

206. Plaintiff Brunick suffered actual injury from the exposure of her Private Information, which violates her rights to privacy.

207. Plaintiff Brunick has suffered imminent and impending injury arising from the substantially increased risk of fraud, identity theft, and misuse resulting from her Private Information being placed in the hands of unauthorized third parties and possibly criminals.

208. Upon information and belief, Plaintiff Brunick's Private Information was compromised as a result of the Data Breach.

209. Plaintiff Brunick has a continuing interest in ensuring that her Private Information, which, upon information and belief, remains backed up in Defendant's possession, is protected, and is safeguarded from future breaches.

### *Plaintiff Geoffrey Caquias Experience*

210. Plaintiff Caquias is a former patient of Defendant and is a data breach victim. As a condition of receiving a vaccination from Defendant, Plaintiff Caquias provided Defendant with his Private Information, which was used to facilitate treatment of Plaintiff. Defendant required Plaintiff Caquias to provide that Private Information to obtain treatment and care.

211.     Plaintiff Caquias received a Notice Letter from Defendant on or around September 17, 2025, informing him that his Private Information was exposed in Defendant's Data Breach. *See* Ex. A.

212.     Defendant deprived Plaintiff Caquias of the earliest opportunity to guard himself against the Data Breach's effects by failing to promptly notify him.

213.     As a result of its inadequate cybersecurity, Defendant exposed Plaintiff Caquias's Private Information for theft by cybercriminals and sale on the dark web.

214.     As a result of the Data Breach, Plaintiff Caquias spent time dealing with the consequences of the Data Breach, which includes consistently monitoring his financial accounts a few times a week to ensure no fraudulent activity has occurred. Additionally, Plaintiff Caquias has spent time communicating and complying with counsel in this matter. This time has been lost forever and cannot be recaptured.

215.     Plaintiff Caquias has and will spend considerable time and effort monitoring his accounts to protect himself from additional identity theft. Plaintiff Caquias fears for his personal financial security and uncertainty over what Private Information was exposed in the Data Breach.

216.     Plaintiff Caquias has and is experiencing feelings of anxiety, stress, fear, and frustration because of the Data Breach. This goes far beyond allegations of mere worry or inconvenience; it is exactly the sort of injury and harm to a Data Breach victim that the law contemplates and addresses.

217.     Plaintiff Caquias has suffered actual injury in the form of damages to and diminution in the value of his Private Information—a form of intangible property that Plaintiff entrusted to Defendant, which was compromised in and as a result of the Data Breach.

218.    Plaintiff Caquias suffered actual injury from the exposure of his Private Information, which violates his rights to privacy.

219.    Plaintiff Caquias has suffered imminent and impending injury arising from the substantially increased risk of fraud, identity theft, and misuse resulting from his Private Information being placed in the hands of unauthorized third parties and possibly criminals.

220.    Following the Data Breach, Plaintiff Caquias has received many notifications from Google alerting him that his information has been found on the dark web.

221.    Once an individual's Private Information is for sale and access on the dark web, as Plaintiff Caquias's Private Information is here as a result of the Breach, cybercriminals are able to use the stolen and compromised to gather and steal even more information.[44] Upon information and belief, Plaintiff Caquias's name, address, date of birth, Social Security number, driver's license number, and medical record number were all compromised as a result of the Data Breach, *see* Ex. A – which is certainly a sufficient breadth of information to be able to begin harassing Plaintiff through spam communications in attempts to extract more information from him.

222.    Plaintiff Caquias has a continuing interest in ensuring that his Private Information, which, upon information and belief, remains backed up in Defendant's possession, is protected, and is safeguarded from future breaches.

***Plaintiff Saundra Cooper's Experience***

223.    Plaintiff Cooper is a current patient of Defendant and is a data breach victim. As a condition of treatment as a patient with Defendant, Plaintiff Cooper provided Defendant with her

---

[44] *What do Hackers Do with Stolen Information?*, AURA (Sept. 5, 2023), https://www.aura.com/learn/what-do-hackers-do-with-stolen-information.

Private Information, which was used to facilitate treatment of Plaintiff. Defendant required Plaintiff Cooper to provide that Private Information to obtain treatment and care.

224.    Plaintiff Cooper received a Notice Letter from Defendant on or around September 17, 2025, informing her that her Private Information was exposed in Defendant's Data Breach. *See* Ex. A.

225.    Defendant deprived Plaintiff Cooper of the earliest opportunity to guard herself against the Data Breach's effects by failing to promptly notify her.

226.    As a result of its inadequate cybersecurity, Defendant exposed Plaintiff Cooper's Private Information for theft by cybercriminals and sale on the dark web.

227.    As a result of the Data Breach, Plaintiff Cooper spent time dealing with the consequences of the Data Breach, which includes consistently monitoring her financial accounts a few times a week to ensure no fraudulent activity has occurred. Additionally, Plaintiff Cooper has spent time communicating and complying with counsel in this matter. This time has been lost forever and cannot be recaptured.

228.    Plaintiff Cooper has and will spend considerable time and effort monitoring her accounts to protect herself from additional identity theft. Plaintiff Cooper fears for her personal financial security and uncertainty over what Private Information was exposed in the Data Breach.

229.    Plaintiff Cooper has and is experiencing feelings of anxiety, stress, fear, and frustration because of the Data Breach. This goes far beyond allegations of mere worry or inconvenience; it is exactly the sort of injury and harm to a Data Breach victim that the law contemplates and addresses.

230.    Plaintiff Cooper has suffered actual injury in the form of damages to and diminution in the value of her Private Information—a form of intangible property that Plaintiff entrusted to Defendant, which was compromised in and as a result of the Data Breach.

231.    Plaintiff Cooper suffered actual injury from the exposure of her Private Information, which violates her rights to privacy.

232.    Plaintiff Cooper has suffered imminent and impending injury arising from the substantially increased risk of fraud, identity theft, and misuse resulting from her Private Information being placed in the hands of unauthorized third parties and possibly criminals.

233.    Following the Data Breach, Plaintiff Cooper began suffering a significant increase in spam calls and texts. These spam calls and texts suggest that her Private Information is now in the hands of cybercriminals. Additionally, Plaintiff Cooper's Onepay debit card, the same card she used and had on file at Defendant, was hacked in January 2026 and she lost $500.

234.    Once an individual's Private Information is for sale and access on the dark web, as Plaintiff Cooper's Private Information is here as a result of the Breach, cybercriminals are able to use the stolen and compromised to gather and steal even more information.[45] Upon information and belief, Plaintiff Cooper's name, address, date of birth, Social Security number, driver's license number, and medical record number were all compromised as a result of the Data Breach, *see* Ex. A – which is certainly a sufficient breadth of information to be able to begin harassing Plaintiff through spam communications in attempts to extract more information from her.

---

[45] *What do Hackers Do with Stolen Information?*, AURA (Sept. 5, 2023), https://www.aura.com/learn/what-do-hackers-do-with-stolen-information.

235.    Plaintiff Cooper has a continuing interest in ensuring that her Private Information, which, upon information and belief, remains backed up in Defendant's possession, is protected, and is safeguarded from future breaches.

**Plaintiff Veronica Darden's Experience**

236.    Plaintiff Darden is a current patient of Defendant and is a data breach victim. As a condition of treatment as a patient with Defendant, Plaintiff Darden provided Defendant with her Private Information, which was used to facilitate treatment of Plaintiff. Defendant required Plaintiff Darden to provide that Private Information to obtain treatment and care.

237.    Plaintiff Darden received a Notice Letter from Defendant on or around September 17, 2025, informing her that her Private Information was exposed in Defendant's Data Breach. *See* Ex. A.

238.    Defendant deprived Plaintiff Darden of the earliest opportunity to guard herself against the Data Breach's effects by failing to promptly notify her.

239.    As a result of its inadequate cybersecurity, Defendant exposed Plaintiff Darden's Private Information for theft by cybercriminals and sale on the dark web.

240.    As a result of the Data Breach, Plaintiff Darden spent time dealing with the consequences of the Data Breach, which includes consistently monitoring her financial accounts a few times a week to ensure no fraudulent activity has occurred. Additionally, Plaintiff Darden has spent time communicating and complying with counsel in this matter. This time has been lost forever and cannot be recaptured.

241.    Plaintiff Darden has and will spend considerable time and effort monitoring her accounts to protect herself from additional identity theft. Plaintiff Darden fears for her personal financial security and uncertainty over what Private Information was exposed in the Data Breach.

242.    Plaintiff Darden has and is experiencing feelings of anxiety, stress, fear, and frustration because of the Data Breach. This goes far beyond allegations of mere worry or inconvenience; it is exactly the sort of injury and harm to a Data Breach victim that the law contemplates and addresses.

243.    Plaintiff Darden has suffered actual injury in the form of damages to and diminution in the value of her Private Information—a form of intangible property that Plaintiff entrusted to Defendant, which was compromised in and as a result of the Data Breach.

244.    Plaintiff Darden suffered actual injury from the exposure of her Private Information, which violates her rights to privacy.

245.    Plaintiff Darden has suffered imminent and impending injury arising from the substantially increased risk of fraud, identity theft, and misuse resulting from her Private Information being placed in the hands of unauthorized third parties and possibly criminals.

246.    Following the Data Breach, in June 2025, Plaintiff Darden experienced fraud on her Wells Fargo account when someone transferred $289 to a cash app and spent it on bitcoin. Around the same time, she also experienced fraud on her Chime credit card when $185 was transferred to cash app. Chime refused to return the funds.

247.    Once an individual's Private Information is for sale and access on the dark web, as Plaintiff Darden's Private Information is here as a result of the Breach, cybercriminals are able to use the stolen and compromised to gather and steal even more information.[46] Upon information and belief, Plaintiff Darden's name, address, date of birth, Social Security number, driver's license number, and medical record number were all compromised as a result of the Data Breach, *see* Ex.

---

[46] *What do Hackers Do with Stolen Information?*, AURA (Sept. 5, 2023), https://www.aura.com/learn/what-do-hackers-do-with-stolen-information.

A – which is certainly a sufficient breadth of information to be able to begin harassing Plaintiff through spam communications in attempts to extract more information from her.

248.    Plaintiff Darden has a continuing interest in ensuring that her Private Information, which, upon information and belief, remains backed up in Defendant's possession, is protected, and is safeguarded from future breaches.

**_Plaintiff Francina Freeman's Experience_**

249.    Plaintiff Freeman is a current patient of Defendant and is a data breach victim. Plaintiff Freeman has been a patient of Defendant for approximately 15 years. As a condition of treatment as a patient with Defendant, Plaintiff Freeman provided Defendant with her Private Information, which was used to facilitate treatment of Plaintiff. Defendant required Plaintiff Freeman to provide that Private Information to obtain treatment and care.

250.    Plaintiff Freeman received a Notice Letter from Defendant on or around September 17, 2025, informing her that her Private Information was exposed in Defendant's Data Breach. *See* Ex. A.

251.    Defendant deprived Plaintiff Freeman of the earliest opportunity to guard herself against the Data Breach's effects by failing to promptly notify her.

252.    As a result of its inadequate cybersecurity, Defendant exposed Plaintiff Freeman's Private Information for theft by cybercriminals and sale on the dark web.

253.    As a result of the Data Breach, Plaintiff Freeman spent time dealing with the consequences of the Data Breach, which includes consistently monitoring her financial accounts a few times a week to ensure no fraudulent activity has occurred. Additionally, Plaintiff Freeman has spent time communicating and complying with counsel in this matter. This time has been lost forever and cannot be recaptured.

254.     Plaintiff Freeman has and will spend considerable time and effort monitoring her accounts to protect herself from additional identity theft. Plaintiff Freeman fears for her personal financial security and uncertainty over what Private Information was exposed in the Data Breach.

255.     Plaintiff Freeman has and is experiencing feelings of anxiety, stress, fear, and frustration because of the Data Breach. This goes far beyond allegations of mere worry or inconvenience; it is exactly the sort of injury and harm to a Data Breach victim that the law contemplates and addresses.

256.     Plaintiff Freeman has suffered actual injury in the form of damages to and diminution in the value of her Private Information—a form of intangible property that Plaintiff entrusted to Defendant, which was compromised in and as a result of the Data Breach.

257.     Plaintiff Freeman suffered actual injury from the exposure of her Private Information, which violates her rights to privacy.

258.     Plaintiff Freeman has suffered imminent and impending injury arising from the substantially increased risk of fraud, identity theft, and misuse resulting from her Private Information being placed in the hands of unauthorized third parties and possibly criminals.

259.     Following and as a result of the Data Breach, Plaintiff Freeman began suffering a significant increase in spam calls and texts on the number she provided to Defendant. In particular, Plaintiff frequently receives a spam call late in the evening where the caller has details of her medical history that only Defendant knows and seeks a pre-approval for insurance coverage. Plaintiff has called her health insurance company about this, and they have confirmed they are not calling her and seeking pre-approvals. These spam calls and texts suggest that her Private Information that was held by Goshen is now in the hands of cybercriminals.

260.    Additionally, Plaintiff Freeman experienced bank card fraud in September 2025 when someone spent $50 at Sam's Club using her Wells Fargo card. She has not received a refund for this expense and is still disputing it. In addition, she received communications from Wells Fargo Bank of fraudulent activities on her account. She has been required to get new financial cards, change her PINs, and change passwords to mitigate these activities. Plaintiff Freeman has spent approximately six hours calling various companies, waiting on the phone, changing pins and passwords, waiting for bank's investigation to end. As a result, Plaintiff Freeman currently monitors accounts constantly—every day. Given the timing of the Breach and the theft of Private Information, Plaintiff reasonably believes this fraudulent activity resulted from Defendant's Data Breach. In addition, she has not received other data breach notices.

261.    Once an individual's Private Information is for sale and access on the dark web, as Plaintiff Freeman's Private Information is here as a result of the Breach, cybercriminals are able to use the stolen and compromised to gather and steal even more information.[47] Upon information and belief, Plaintiff Freeman's name, address, date of birth, Social Security number, driver's license number, and medical record number were all compromised as a result of the Data Breach (*see* Ex. A), which is certainly a sufficient breadth of information to be able to begin harassing Plaintiff through spam communications in attempts to extract more information from her.

262.    Plaintiff Freeman has a continuing interest in ensuring that her Private Information, which, upon information and belief, remains backed up in Defendant's possession, is protected, and is safeguarded from future breaches.

***Plaintiff Arthur Maxwell's Experience***

---

[47] *What do Hackers Do with Stolen Information?*, AURA (Sept. 5, 2023), https://www.aura.com/learn/what-do-hackers-do-with-stolen-information.

263. Plaintiff Maxwell is a current patient of Defendant and is a data breach victim. As a condition of treatment as a patient with Defendant, Plaintiff Maxwell provided Defendant with his Private Information, which was used to facilitate treatment of Plaintiff. Defendant required Plaintiff Maxwell to provide that Private Information to obtain treatment and care.

264. Plaintiff Maxwell received a Notice Letter from Defendant on or around September 17, 2025, informing him that his Private Information was exposed in Defendant's Data Breach. *See* Ex. A.

265. Defendant deprived Plaintiff Maxwell of the earliest opportunity to guard himself against the Data Breach's effects by failing to promptly notify him.

266. As a result of its inadequate cybersecurity, Defendant exposed Plaintiff Maxwell's Private Information for theft by cybercriminals and sale on the dark web.

267. As a result of the Data Breach, Plaintiff Maxwell spent time dealing with the consequences of the Data Breach, which includes consistently monitoring his financial accounts a few times a week to ensure no fraudulent activity has occurred. Additionally, Plaintiff Maxwell has spent time communicating and complying with counsel in this matter. This time has been lost forever and cannot be recaptured.

268. Plaintiff Maxwell has and will spend considerable time and effort monitoring his accounts to protect himself from additional identity theft. Plaintiff Maxwell fears for his personal financial security and uncertainty over what Private Information was exposed in the Data Breach.

269. Plaintiff Maxwell has and is experiencing feelings of anxiety, stress, fear, and frustration because of the Data Breach. This goes far beyond allegations of mere worry or inconvenience; it is exactly the sort of injury and harm to a Data Breach victim that the law contemplates and addresses.

270.    Plaintiff Maxwell has suffered actual injury in the form of damages to and diminution in the value of his Private Information—a form of intangible property that Plaintiff entrusted to Defendant, which was compromised in and as a result of the Data Breach.

271.    Plaintiff Maxwell suffered actual injury from the exposure of his Private Information, which violates his rights to privacy.

272.    Plaintiff Maxwell has suffered imminent and impending injury arising from the substantially increased risk of fraud, identity theft, and misuse resulting from his Private Information being placed in the hands of unauthorized third parties and possibly criminals.

273.    Once an individual's Private Information is for sale and access on the dark web, as Plaintiff Maxwell's Private Information is here as a result of the Breach, cybercriminals are able to use the stolen and compromised to gather and steal even more information.[48] Upon information and belief, Plaintiff Maxwell's name, address, date of birth, Social Security number, driver's license number, and medical record number were all compromised as a result of the Data Breach, *see* Ex. A – which is certainly a sufficient breadth of information to be able to begin harassing Plaintiff through spam communications in attempts to extract more information from him.

274.    Plaintiff Maxwell has a continuing interest in ensuring that his Private Information, which, upon information and belief, remains backed up in Defendant's possession, is protected, and is safeguarded from future breaches.

***Plaintiff Decarlos McNair's Experience***

275.    Plaintiff McNair is a current patient of Defendant and is a data breach victim. As a condition of treatment as a patient with Defendant, Plaintiff McNair provided Defendant with his

---

[48] *What do Hackers Do with Stolen Information?*, AURA (Sept. 5, 2023), https://www.aura.com/learn/what-do-hackers-do-with-stolen-information.

Private Information, which was used to facilitate treatment of Plaintiff. Defendant required Plaintiff to provide that Private Information to obtain treatment and care.

276.     Plaintiff McNair received a Notice Letter from Defendant on or around September 17, 2025, informing him that his Private Information was exposed in Defendant's Data Breach. *See* Ex. A.

277.     Defendant deprived Plaintiff McNair of the earliest opportunity to guard himself against the Data Breach's effects by failing to promptly notify him.

278.     As a result of its inadequate cybersecurity, Defendant exposed Plaintiff McNair's Private Information for theft by cybercriminals and sale on the dark web.

279.     As a result of the Data Breach, Plaintiff McNair spent time dealing with the consequences of the Data Breach, which includes consistently monitoring his financial accounts a few times a week to ensure no fraudulent activity has occurred. Additionally, Plaintiff McNair has spent time communicating and complying with counsel in this matter. This time has been lost forever and cannot be recaptured.

280.     Plaintiff McNair has and will spend considerable time and effort monitoring his accounts to protect himself from additional identity theft. Plaintiff McNair fears for his personal financial security and uncertainty over what Private Information was exposed in the Data Breach.

281.     Plaintiff McNair has and is experiencing feelings of anxiety, stress, fear, and frustration because of the Data Breach. This goes far beyond allegations of mere worry or inconvenience; it is exactly the sort of injury and harm to a Data Breach victim that the law contemplates and addresses.

282.    Plaintiff McNair has suffered actual injury in the form of damages to and diminution in the value of his Private Information—a form of intangible property that Plaintiff entrusted to Defendant, which was compromised in and as a result of the Data Breach.

283.    Plaintiff McNair suffered actual injury from the exposure of his Private Information, which violates his rights to privacy.

284.    Plaintiff McNair has suffered imminent and impending injury arising from the substantially increased risk of fraud, identity theft, and misuse resulting from his Private Information being placed in the hands of unauthorized third parties and possibly criminals.

285.    Following the Data Breach, Plaintiff McNair began suffering a significant increase in spam calls and texts. These spam calls and texts suggest that his Private Information is now in the hands of cybercriminals. Additionally, Plaintiff McNair suffered fraud on his Visa Cash App card, receiving a notification indicating that money was removed from his account to pay for charges on the Google Play App. Luckily, Plaintiff was able to dispute the charges and get them reversed, taking several hours of his time. Plaintiff McNair also experienced credit card fraud in October 2025, with a credit card being fraudulently opened in his name. Plaintiff McNair also received several concerning letters in September and October 2025 regarding purchases of and warranties on vehicles he did not purchase in states and cities in which he did not live. Plaintiff had never received letters like this prior to September 2025.

286.    Once an individual's Private Information is for sale and access on the dark web, as Plaintiff McNair's Private Information is here as a result of the Breach, cybercriminals are able to use the stolen and compromised to gather and steal even more information.[49] Upon information

---

[49] *What do Hackers Do with Stolen Information?*, AURA (Sept. 5, 2023), https://www.aura.com/learn/what-do-hackers-do-with-stolen-information.

and belief, Plaintiff McNair's name, address, date of birth, Social Security number, driver's license number, and medical record number were all compromised as a result of the Data Breach, *see* A. XX – which is certainly a sufficient breadth of information to be able to begin harassing Plaintiff through spam communications in attempts to extract more information from him.

287. Plaintiff McNair has a continuing interest in ensuring that his Private Information, which, upon information and belief, remains backed up in Defendant's possession, is protected, and is safeguarded from future breaches.

**Plaintiff Melissa Mealer's Experience**

288. Plaintiff Mealer is a current patient of Defendant and is a data breach victim. As a condition of treatment as a patient with Defendant, Plaintiff Mealer provided Defendant with her Private Information, which was used to facilitate treatment of Plaintiff. Defendant required Plaintiff Mealer to provide that Private Information to obtain treatment and care.

289. Plaintiff Mealer received a Notice Letter from Defendant on or around September 17, 2025, informing her that her Private Information was exposed in Defendant's Data Breach. *See* Ex. A.

290. Defendant deprived Plaintiff Mealer of the earliest opportunity to guard herself against the Data Breach's effects by failing to promptly notify her.

291. As a result of its inadequate cybersecurity, Defendant exposed Plaintiff Mealer's Private Information for theft by cybercriminals and sale on the dark web.

292. As a result of the Data Breach, Plaintiff Mealer spent time dealing with the consequences of the Data Breach, which includes consistently monitoring her financial accounts a few times a week to ensure no fraudulent activity has occurred. She has had to leave work early to go to the bank to protect herself and her accounts. Additionally, Plaintiff Mealer has spent time

communicating and complying with counsel in this matter. This time has been lost forever and cannot be recaptured.

293. Plaintiff Mealer has and will spend considerable time and effort monitoring her accounts to protect herself from additional identity theft. Plaintiff Mealer fears for her personal financial security and uncertainty over what Private Information was exposed in the Data Breach.

294. Plaintiff Mealer has and is experiencing feelings of anxiety, stress, fear, and frustration because of the Data Breach. This goes far beyond allegations of mere worry or inconvenience; it is exactly the sort of injury and harm to a Data Breach victim that the law contemplates and addresses.

295. Plaintiff Mealer has suffered actual injury in the form of damages to and diminution in the value of her Private Information—a form of intangible property that Plaintiff entrusted to Defendant, which was compromised in and as a result of the Data Breach.

296. Plaintiff Mealer suffered actual injury from the exposure of her Private Information, which violates her rights to privacy.

297. Plaintiff Mealer has suffered imminent and impending injury arising from the substantially increased risk of fraud, identity theft, and misuse resulting from her Private Information being placed in the hands of unauthorized third parties and possibly criminals.

298. Following the Data Breach, Plaintiff Mealer began suffering a significant increase in spam calls and texts. These spam calls and texts suggest that her Private Information is now in the hands of cybercriminals.

299. Once an individual's Private Information is for sale and access on the dark web, as Plaintiff Mealer's Private Information is here as a result of the Breach, cybercriminals are able to

use the stolen and compromised to gather and steal even more information.[50] Upon information and belief, Plaintiff Mealer's name, address, date of birth, Social Security number, driver's license number, and medical record number were all compromised as a result of the Data Breach, *see* Ex. A – which is certainly a sufficient breadth of information to be able to begin harassing Plaintiff through spam communications in attempts to extract more information from her.

300.    Plaintiff Mealer has a continuing interest in ensuring that her Private Information, which, upon information and belief, remains backed up in Defendant's possession, is protected, and is safeguarded from future breaches.

### *Plaintiff Gary Ortega's Experience*

301.    Plaintiff Ortega was patient of Defendant and is a data breach victim. As a condition of treatment as a patient with Defendant, Plaintiff Ortega provided Defendant with his Private Information, which was used to facilitate treatment of Plaintiff. Defendant required Plaintiff Brunick to provide that Private Information to obtain treatment and care.

302.    Plaintiff Ortega received a Notice Letter from Defendant on or around September 17, 2025, informing him that his Private Information was exposed in Defendant's Data Breach. *See* Ex. A.

303.    Defendant deprived Plaintiff Ortega of the earliest opportunity to guard himself against the Data Breach's effects by failing to promptly notify him.

304.    As a result of its inadequate cybersecurity, Defendant exposed Plaintiff Ortega's Private Information for theft by cybercriminals and sale on the dark web.

---

[50] *What do Hackers Do with Stolen Information?*, AURA (Sept. 5, 2023), https://www.aura.com/learn/what-do-hackers-do-with-stolen-information.

305. As a result of the Data Breach, Plaintiff Ortega spent time dealing with the consequences of the Data Breach, which includes consistently monitoring her financial accounts a few times a week to ensure no fraudulent activity has occurred. Additionally, Plaintiff Ortega has spent time communicating and complying with counsel in this matter. This time has been lost forever and cannot be recaptured.

306. Plaintiff Ortega has and will spend considerable time and effort monitoring his accounts to protect himself from additional identity theft. Plaintiff Ortega fears for his personal financial security and uncertainty over what Private Information was exposed in the Data Breach.

307. Plaintiff Ortega has and is experiencing feelings of anxiety, stress, fear, and frustration because of the Data Breach. This goes far beyond allegations of mere worry or inconvenience; it is exactly the sort of injury and harm to a Data Breach victim that the law contemplates and addresses.

308. Plaintiff Ortega has suffered actual injury in the form of damages to and diminution in the value of his Private Information—a form of intangible property that Plaintiff entrusted to Defendant, which was compromised in and as a result of the Data Breach.

309. Plaintiff Ortega suffered actual injury from the exposure of his Private Information, which violates his rights to privacy.

310. Plaintiff Ortega has suffered imminent and impending injury arising from the substantially increased risk of fraud, identity theft, and misuse resulting from his Private Information being placed in the hands of unauthorized third parties and possibly criminals.

311. Upon information and belief, Plaintiff Ortega's name, address, date of birth, Social Security number, driver's license number, and medical record number were all compromised as a result of the Data Breach, *see* Ex. A – which is certainly a sufficient breadth of information to be

able to begin harassing Plaintiff through spam communications in attempts to extract more information from him.

312.     Plaintiff Bass has a continuing interest in ensuring that his Private Information, which, upon information and belief, remains backed up in Defendant's possession, is protected, and is safeguarded from future breaches.

### *Plaintiff Jennifer Stuckey's Experience*

313.     Plaintiff Stuckey is a current patient of Defendant and is a data breach victim. As a condition of treatment as a patient with Defendant, Plaintiff Stuckey provided Defendant with her Private Information, which was used to facilitate treatment of Plaintiff. Defendant required Plaintiff Stuckey to provide that Private Information to obtain treatment and care.

314.     Plaintiff Stuckey received a Notice Letter from Defendant on or around September 17, 2025, informing her that her Private Information was exposed in Defendant's Data Breach. *See* Ex. A.

315.     Defendant deprived Plaintiff Stuckey of the earliest opportunity to guard herself against the Data Breach's effects by failing to promptly notify her.

316.     As a result of its inadequate cybersecurity, Defendant exposed Plaintiff Stuckey's Private Information for theft by cybercriminals and sale on the dark web.

317.     As a result of the Data Breach, Plaintiff Stuckey spent time dealing with the consequences of the Data Breach, which includes consistently monitoring her financial accounts a few times a week to ensure no fraudulent activity has occurred. Additionally, Plaintiff Stuckey has spent time communicating and complying with counsel in this matter. This time has been lost forever and cannot be recaptured.

318.   Plaintiff Stuckey has and will spend considerable time and effort monitoring her accounts to protect herself from additional identity theft. Plaintiff Stuckey fears for her personal financial security and uncertainty over what Private Information was exposed in the Data Breach.

319.   Plaintiff Stuckey has and is experiencing feelings of anxiety, stress, fear, and frustration because of the Data Breach. This goes far beyond allegations of mere worry or inconvenience; it is exactly the sort of injury and harm to a Data Breach victim that the law contemplates and addresses.

320.   Plaintiff Stuckey has suffered actual injury in the form of damages to and diminution in the value of her Private Information—a form of intangible property that Plaintiff entrusted to Defendant, which was compromised in and as a result of the Data Breach.

321.   Plaintiff Stuckey suffered actual injury from the exposure of her Private Information, which violates her rights to privacy.

322.   Plaintiff Stuckey has suffered imminent and impending injury arising from the substantially increased risk of fraud, identity theft, and misuse resulting from her Private Information being placed in the hands of unauthorized third parties and possibly criminals.

323.   Once an individual's Private Information is for sale and access on the dark web, as Plaintiff Stuckey's Private Information is here as a result of the Breach, cybercriminals are able to use the stolen and compromised to gather and steal even more information.[51] Upon information and belief, Plaintiff Stuckey's name, address, date of birth, Social Security number, driver's license number, and medical record number were all compromised as a result of the Data Breach, *see* Ex.

---

[51] *What do Hackers Do with Stolen Information?*, AURA (Sept. 5, 2023), https://www.aura.com/learn/what-do-hackers-do-with-stolen-information.

A – which is certainly a sufficient breadth of information to be able to begin harassing Plaintiff through spam communications in attempts to extract more information from her.

324.     Plaintiff Stuckey has a continuing interest in ensuring that her Private Information, which, upon information and belief, remains backed up in Defendant's possession, is protected, and is safeguarded from future breaches.

**Plaintiff Hope Tucker's Experience**

325.     Plaintiff Tucker is a former patient of Defendant and is a data breach victim. As a condition of treatment as a patient with Defendant, Plaintiff Tucker provided Defendant with her Private Information, which was used to facilitate treatment of Plaintiff. Defendant required Plaintiff Tucker to provide that Private Information to obtain treatment and care.

326.     Plaintiff Tucker received a Notice Letter from Defendant on or around September 17, 2025, informing her that her Private Information was exposed in Defendant's Data Breach. *See* Ex. A.

327.     Defendant deprived Plaintiff Tucker of the earliest opportunity to guard herself against the Data Breach's effects by failing to promptly notify her.

328.     As a result of its inadequate cybersecurity, Defendant exposed Plaintiff Tucker's Private Information for theft by cybercriminals and sale on the dark web.

329.     As a result of the Data Breach, Plaintiff Tucker spent time dealing with the consequences of the Data Breach, which includes consistently monitoring her financial accounts a few times a week to ensure no fraudulent activity has occurred. Additionally, Plaintiff Tucker has spent time communicating and complying with counsel in this matter. This time has been lost forever and cannot be recaptured.

330.    Plaintiff Tucker has and will spend considerable time and effort monitoring her accounts to protect herself from additional identity theft. Plaintiff Tucker fears for her personal financial security and uncertainty over what Private Information was exposed in the Data Breach.

331.    Plaintiff Tucker has and is experiencing feelings of anxiety, stress, fear, and frustration because of the Data Breach. This goes far beyond allegations of mere worry or inconvenience; it is exactly the sort of injury and harm to a Data Breach victim that the law contemplates and addresses.

332.    Plaintiff Tucker has suffered actual injury in the form of damages to and diminution in the value of her Private Information—a form of intangible property that Plaintiff entrusted to Defendant, which was compromised in and as a result of the Data Breach.

333.    Plaintiff Tucker suffered actual injury from the exposure of her Private Information, which violates her rights to privacy.

334.    Plaintiff Tucker has suffered imminent and impending injury arising from the substantially increased risk of fraud, identity theft, and misuse resulting from her Private Information being placed in the hands of unauthorized third parties and possibly criminals.

335.    Once an individual's Private Information is for sale and access on the dark web, as Plaintiff Tucker's Private Information is here as a result of the Breach, cybercriminals are able to use the stolen and compromised to gather and steal even more information.[52] Upon information and belief, Plaintiff Tucker's name, address, date of birth, Social Security number, driver's license number, and medical record number were all compromised as a result of the Data Breach, *see* Ex.

---

[52] *What do Hackers Do with Stolen Information?*, AURA (Sept. 5, 2023), https://www.aura.com/learn/what-do-hackers-do-with-stolen-information.

A – which is certainly a sufficient breadth of information to be able to begin harassing Plaintiff through spam communications in attempts to extract more information from her.

336. Plaintiff Tucker has a continuing interest in ensuring that her Private Information, which, upon information and belief, remains backed up in Defendant's possession, is protected, and is safeguarded from future breaches.

**Plaintiff Barbara White's Experience**

337. Plaintiff Barbara White is a current patient of Defendant and is a data breach victim. As a condition of treatment as a patient with Defendant, Plaintiff Barbara White provided Defendant with her Private Information, which was used to facilitate treatment of Plaintiff. Defendant required Plaintiff Barbara White to provide that Private Information to obtain treatment and care.

338. Plaintiff Barbara White received a Notice Letter from Defendant on or around September 17, 2025, informing her that her Private Information was exposed in Defendant's Data Breach. *See* Ex. A.

339. Defendant deprived Plaintiff Barbara White of the earliest opportunity to guard herself against the Data Breach's effects by failing to promptly notify her.

340. As a result of its inadequate cybersecurity, Defendant exposed Plaintiff Barbara White's Private Information for theft by cybercriminals and sale on the dark web.

341. As a result of the Data Breach, Plaintiff Barbara White spent time dealing with the consequences of the Data Breach, which includes consistently monitoring her financial accounts a few times a week to ensure no fraudulent activity has occurred. Additionally, Plaintiff Barbara White has spent time communicating and complying with counsel in this matter. This time has been lost forever and cannot be recaptured.

342.     Plaintiff Barbara White has and will spend considerable time and effort monitoring her accounts to protect herself from additional identity theft. After receiving Defendant's notice letter in the mail, Plaintiff Barbara White enrolled in Norton LifeLock identity protection program for approximately $100 a year. Plaintiff Barbara White fears for her personal financial security and uncertainty over what Private Information was exposed in the Data Breach.

343.     Plaintiff Barbara White has and is experiencing feelings of anxiety, stress, fear, and frustration because of the Data Breach. This goes far beyond allegations of mere worry or inconvenience; it is exactly the sort of injury and harm to a Data Breach victim that the law contemplates and addresses.

344.     Plaintiff Barbara White has suffered actual injury in the form of damages to and diminution in the value of her Private Information—a form of intangible property that Plaintiff entrusted to Defendant, which was compromised in and as a result of the Data Breach.

345.     Plaintiff Barbara White suffered actual injury from the exposure of her Private Information, which violates her rights to privacy.

346.     Plaintiff Barbara White has suffered imminent and impending injury arising from the substantially increased risk of fraud, identity theft, and misuse resulting from her Private Information being placed in the hands of unauthorized third parties and possibly criminals.

347.     Once an individual's Private Information is for sale and access on the dark web, as Plaintiff Barbara White's Private Information is here as a result of the Breach, cybercriminals are able to use the stolen and compromised to gather and steal even more information.[53] Upon information and belief, Plaintiff Barbara White's name, address, date of birth, Social Security

---

[53] *What do Hackers Do with Stolen Information?*, AURA (Sept. 5, 2023), https://www.aura.com/learn/what-do-hackers-do-with-stolen-information.

number, driver's license number, and medical record number were all compromised as a result of the Data Breach, *see* Ex. A – which is certainly a sufficient breadth of information to be able to begin harassing Plaintiff through spam communications in attempts to extract more information from her.

348.    Plaintiff Barbara White has a continuing interest in ensuring that her Private Information, which, upon information and belief, remains backed up in Defendant's possession, is protected, and is safeguarded from future breaches.

### *Plaintiff Lynwood White's Experience*

349.    Plaintiff Lynwood White is a current patient of Defendant and is a data breach victim. As a condition of treatment as a patient with Defendant, Plaintiff Lynwood White provided Defendant with his Private Information, which was used to facilitate treatment of Plaintiff. Defendant required Plaintiff to provide that Private Information to obtain treatment and care.

350.    Plaintiff Lynwood White received a Notice Letter from Defendant on or around September 17, 2025, informing him that his Private Information was exposed in Defendant's Data Breach. See Ex. A.

351.    Defendant deprived Plaintiff Lynwood White of the earliest opportunity to guard himself against the Data Breach's effects by failing to promptly notify him.

352.    As a result of its inadequate cybersecurity, Defendant exposed Plaintiff Lynwood White's Private Information for theft by cybercriminals and sale on the dark web.

353.    As a result of the Data Breach, Plaintiff Lynwood White spent time dealing with the consequences of the Data Breach, which includes consistently monitoring his financial accounts a few times a week to ensure no fraudulent activity has occurred. Additionally, Plaintiff

Lynwood White has spent time communicating and complying with counsel in this matter. This time has been lost forever and cannot be recaptured.

354. Plaintiff Lynwood White has and will spend considerable time and effort monitoring his accounts to protect himself from additional identity theft. After receiving Defendant's notice letter in the mail, Plaintiff Lynwood White enrolled in Norton LifeLock identity protection program for approximately $100 a year. Plaintiff Lynwood White fears for his personal financial security and uncertainty over what Private Information was exposed in the Data Breach.

355. Plaintiff Lynwood White has and is experiencing feelings of anxiety, stress, fear, and frustration because of the Data Breach. This goes far beyond allegations of mere worry or inconvenience; it is exactly the sort of injury and harm to a Data Breach victim that the law contemplates and addresses.

356. Plaintiff Lynwood White has suffered actual injury in the form of damages to and diminution in the value of his Private Information—a form of intangible property that Plaintiff entrusted to Defendant, which was compromised in and as a result of the Data Breach.

357. Plaintiff Lynwood White suffered actual injury from the exposure of his Private Information, which violates his rights to privacy.

358. Plaintiff Lynwood White has suffered imminent and impending injury arising from the substantially increased risk of fraud, identity theft, and misuse resulting from his Private Information being placed in the hands of unauthorized third parties and possibly criminals.

359. Once an individual's Private Information is for sale and access on the dark web, as Plaintiff Lynwood White's Private Information is here as a result of the Breach, cybercriminals are

able to use the stolen and compromised to gather and steal even more information.[54] Upon information and belief, Plaintiff Lynwood White's name, address, date of birth, Social Security number, driver's license number, and medical record number were all compromised as a result of the Data Breach, *see* Ex. A – which is certainly a sufficient breadth of information to be able to begin harassing Plaintiff through spam communications in attempts to extract more information from him.

360. Plaintiff Lynwood White has a continuing interest in ensuring that his Private Information, which, upon information and belief, remains backed up in Defendant's possession, is protected, and is safeguarded from future breaches.

361.

### Plaintiff Gloria Williams' Experience

362. Plaintiff Williams is a current patient of Defendant and is a data breach victim. As a condition of treatment as a patient with Defendant, Plaintiff Williams provided Defendant with her Private Information, which was used to facilitate treatment of Plaintiff. Defendant required Plaintiff Williams to provide that Private Information to obtain treatment and care.

363. Plaintiff Williams received a Notice Letter from Defendant on or around September 17, 2025, informing her that her Private Information was exposed in Defendant's Data Breach. *See* Ex. A.

364. Defendant deprived Plaintiff Williams of the earliest opportunity to guard herself against the Data Breach's effects by failing to promptly notify her.

---

[54] *What do Hackers Do with Stolen Information?*, AURA (Sept. 5, 2023), https://www.aura.com/learn/what-do-hackers-do-with-stolen-information.

365.     As a result of its inadequate cybersecurity, Defendant exposed Plaintiff Williams Private Information for theft by cybercriminals and sale on the dark web.

366.     As a result of the Data Breach, Plaintiff Williams spent time dealing with the consequences of the Data Breach, which includes consistently monitoring her financial accounts a few times a week to ensure no fraudulent activity has occurred. Additionally, Plaintiff Williams has spent time communicating and complying with counsel in this matter. This time has been lost forever and cannot be recaptured.

367.     Plaintiff Williams has and will spend considerable time and effort monitoring her accounts to protect herself from additional identity theft. Plaintiff Williams fears for her personal financial security and uncertainty over what Private Information was exposed in the Data Breach.

368.     Plaintiff Williams has and is experiencing feelings of anxiety, stress, fear, and frustration because of the Data Breach. This goes far beyond allegations of mere worry or inconvenience; it is exactly the sort of injury and harm to a Data Breach victim that the law contemplates and addresses.

369.     Plaintiff Williams has suffered actual injury in the form of damages to and diminution in the value of her Private Information—a form of intangible property that Plaintiff entrusted to Defendant, which was compromised in and as a result of the Data Breach.

370.     Plaintiff Williams suffered actual injury from the exposure of her Private Information, which violates her rights to privacy.

371.     Plaintiff Williams has suffered imminent and impending injury arising from the substantially increased risk of fraud, identity theft, and misuse resulting from her Private Information being placed in the hands of unauthorized third parties and possibly criminals.

372. Following the Data Breach, Plaintiff Williams began suffering a significant increase in spam emails. These spam emails suggest that her Private Information is now in the hands of cybercriminals. Additionally, Plaintiff is enrolled in IDX monitoring, which has notified her that her email is located on the dark web. Additionally, Plaintiff Williams experienced identity theft in DATE (either 2024 or 2025) where an unknown individual used her health insurance to obtain healthcare services, causing her receipt of her diabetes medication to be disrupted.

373. Once an individual's Private Information is for sale and access on the dark web, as Plaintiff Williams' Private Information is here as a result of the Breach, cybercriminals are able to use the stolen and compromised to gather and steal even more information.[55] Upon information and belief, Plaintiff Williams' name, address, date of birth, Social Security number, driver's license number, and medical record number were all compromised as a result of the Data Breach, *see* Ex. A – which is certainly a sufficient breadth of information to be able to begin harassing Plaintiff through spam communications in attempts to extract more information from her.

374. Plaintiff Williams has a continuing interest in ensuring that her Private Information, which, upon information and belief, remains backed up in Defendant's possession, is protected, and is safeguarded from future breaches.

## CLASS ALLEGATIONS

375. Plaintiffs bring this action individually and on behalf of all other persons similarly situated, pursuant to N.C. Gen. Stat. § 1A-1, Rule 23.

376. The Nationwide Class that Plaintiffs seek to represent is defined as follows:

---

[55] *What do Hackers Do with Stolen Information?*, AURA (Sept. 5, 2023), https://www.aura.com/learn/what-do-hackers-do-with-stolen-information.

All individuals residing in the United States whose Private Information was compromised in the Data Breach disclosed by Goshen Medical Center, Inc. in September 2025 (the "Class").

377. Excluded from the Class are the following individuals and/or entities: Defendant and Defendant's parents, subsidiaries, affiliates, officers and directors, and any entity in which Defendant have a controlling interest; all individuals who make a timely election to be excluded from this proceeding using the correct protocol for opting out; and all judges assigned to hear any aspect of this litigation, as well as their immediate family members.

378. This proposed class definition is based on the information available to Plaintiffs at this time. Plaintiffs may modify the class definition in an amended pleading or when he moves for class certification, as necessary to account for any newly learned or changed facts as the situation develops and discovery gets underway.

379. Plaintiffs reserve the right to amend the definitions of the Class or add a Class or Subclass if further information and discovery indicate that the definitions of the Class should be narrowed, expanded, or otherwise modified.

380. <u>Numerosity</u>: The Class is so numerous that joinder of all Members is impracticable. The identity of these individuals is within the exclusive knowledge of and can be ascertained only by resort to Defendant's records. The exact number of Class Members is unknown to Plaintiffs now, but Defendant provided notice to the Department of Health and Human Services that 456,385 individuals were affected.[56] Defendant has the administrative capability through its computer systems and other records to identify all Class Members, and such specific information is not otherwise available to Plaintiffs.

---

[56] U.S. DEPT. HEALTH & HUM. SERVS., *supra* note 4.

381.    <u>Commonality and Predominance</u>: Common questions of law and fact exist as to all members of the Class and predominate over any questions affecting solely individual members of the Class. Among the questions of law and fact common to the Class that predominate over questions which may affect individual Class members, including the following:

a.    Whether and to what extent Defendant had a duty to protect the Private Information of Plaintiffs and Class Members;

b.    Whether Defendant had respective duties not to disclose the Private Information of Plaintiffs and Class Members to unauthorized third parties;

c.    Whether Defendant had respective duties not to use the Private Information of Plaintiffs and Class Members for non-business purposes;

d.    Whether Defendant failed to adequately safeguard the Private Information of Plaintiffs and Class Members;

e.    Whether, how, and when Defendant actually learned of the Data Breach;

f.    Whether Defendant adequately, promptly, and accurately informed Plaintiffs and Class Members that their Private Information had been compromised;

g.    Whether Defendant violated the law by failing to promptly notify Plaintiffs and Class Members that their Private Information had been compromised;

h.    Whether Defendant failed to implement and maintain reasonable security procedures and practices appropriate to the nature and scope of the information compromised in the Data Breach;

i.    Whether Defendant adequately addressed and fixed the vulnerabilities which permitted the Data Breach to occur;

j.    Whether Defendant was unjustly enriched;

k. Whether Plaintiffs and Class Members are entitled to actual damages, statutory damages, and/or nominal damages as a result of Defendant's wrongful conduct;

l. Whether Plaintiffs and Class Members are entitled to injunctive relief to redress the imminent and currently ongoing harm faced as a result of the Data Breach.

382. <u>Typicality:</u> Plaintiffs' claims are typical of those of the other members of the Class because Plaintiffs, like every other Class Member, were exposed to virtually identical conduct and now suffer from the same violations of the law as each other member of the Class.

383. <u>Policies Generally Applicable to the Class:</u> This class action is also appropriate for certification because Defendant acted or refused to act on grounds generally applicable to the Class, thereby requiring the Court's imposition of uniform relief to ensure compatible standards of conduct toward the Class Members and making final injunctive relief appropriate with respect to the Class as a whole. Defendant's policies challenged herein apply to and affect Class Members uniformly and Plaintiffs' challenges of these policies hinges on Defendant's conduct with respect to the Class as a whole, not on facts or law applicable only to Plaintiffs.

384. <u>Adequacy:</u> Plaintiffs will fairly and adequately represent and protect the interests of the Class Members in that they have no disabling conflicts of interest that would be antagonistic to those of the other Class Members. Plaintiffs seek no relief that is antagonistic or adverse to the Class Members and the infringement of the rights and the damage they have suffered are typical of other Class Members. Plaintiffs have retained counsel experienced in complex class action and data breach litigation, and Plaintiffs intend to prosecute this action vigorously.

385. <u>Superiority and Manageability:</u> The class litigation is an appropriate method for fair and efficient adjudication of the claims involved. Class action treatment is superior to all other

available methods for the fair and efficient adjudication of the controversy alleged herein; it will permit a large number of Class Members to prosecute their common claims in a single forum simultaneously, efficiently, and without the unnecessary duplication of evidence, effort, and expense that hundreds of individual actions would require. Class action treatment will permit the adjudication of relatively modest claims by certain Class Members, who could not individually afford to litigate a complex claim against large corporations, like Defendant. Further, even for those Class Members who could afford to litigate such a claim, it would still be economically impractical and impose a burden on the courts. A class action is superior to the other available methods for the fair and efficient adjudication of this controversy because:

a. The unnamed Class Members are unlikely to have an interest in individually controlling the prosecution of separate actions;

b. Concentrating the litigation of the claims in one forum is desirable; Plaintiffs anticipate no difficulty in the management of this litigation as a class action; and

c. Plaintiffs' legal counsel has the financial and legal resources to meet the substantial costs and legal issues associated with this type of litigation.

386. The nature of this action and the nature of laws available to Plaintiffs and Class Members make the use of the class action device a particularly efficient and appropriate procedure to afford relief to Plaintiffs and Class Members for the wrongs alleged because Defendant would necessarily gain an unconscionable advantage since they would be able to exploit and overwhelm the limited resources of each individual Class Member with superior financial and legal resources; the costs of individual suits could unreasonably consume the amounts that would be recovered; proof of a common course of conduct to which Plaintiffs were exposed to is representative of that experienced by the Class and will establish the right of each Class Member to recover on the cause

of action alleged; and individual actions would create a risk of inconsistent results and would be unnecessary and duplicative of this litigation.

387. The litigation of the claims brought herein is manageable. Defendant's uniform conduct, the consistent provisions of the relevant laws, and the ascertainable identities of Class Members demonstrates that there would be no significant manageability problems with prosecuting this lawsuit as a class action.

388. Adequate notice can be given to Class Members directly using information maintained in Defendant's records.

389. Unless a Class-wide injunction is issued, Defendant may continue in its failure to properly secure the Private Information of Class Members, Defendant may continue to refuse to provide adequate notification to Class Members regarding the Data Breach, and Defendant may continue to act unlawfully as set forth in this Complaint.

390. Further, Defendant has acted on grounds that apply generally to the Class as a whole, so that class certification, injunctive relief, and corresponding declaratory relief are appropriate on a class- wide basis.

391. Likewise, particular issues are appropriate for certification because such claims present only particular, common issues, the resolution of which would advance the disposition of this matter and the parties' interests therein. Such particular issues include, but are not limited to:

    a. Whether Defendant failed to timely notify the Plaintiffs and the Class of the Data Breach;

    b. Whether Defendant owed a legal duty to Plaintiffs and the Class to exercise due care in collecting, storing, and safeguarding their Private Information;

c.  Whether Defendant's security measures to protect its data systems were reasonable in light of best practices recommended by data security experts;

d.  Whether Defendant's failure to institute adequate protective security measures amounted to negligence;

e.  Whether Defendant failed to take commercially reasonable steps to safeguard patient Private Information; and

f.  Whether adherence to FTC data security recommendations, and measures recommended by data security experts would have reasonably prevented the Data Breach.

392.  Finally, all Members of the proposed Class are readily ascertainable. Defendant has access to current and former patient names and addresses affected by the Data Breach. Using this information, Class Members can be identified and ascertained for the purpose of providing constitutionally sufficient notice.

## CAUSES OF ACTION

### COUNT I
### NEGLIGENCE
**(On Behalf of Plaintiffs and the Class)**

393.  Plaintiffs re-allege and incorporate by reference all of the allegations contained in paragraphs 1 through 392, as if fully set forth herein.

394.  Plaintiffs bring this claim individually and on behalf of the Class Members.

395.  Defendant knowingly collected, came into possession of, and maintained Plaintiffs' and Class Members' Private Information, and had a duty to exercise reasonable care in safeguarding, securing, and protecting such information from being compromised, lost, stolen, misused, and/or disclosed to unauthorized parties.

396. Defendant owed a duty to Plaintiffs and Class Members to create and implement reasonable data security practices and procedures to protect the Private Information in its possession, including adequately training employees and others who accessed Private Information within computer systems on how to adequately protect Private Information.

397. Defendant has a duty to have procedures in place to detect and prevent the loss or unauthorized dissemination of Plaintiffs' and Class Members' Private Information.

398. Defendant owed a duty to Plaintiffs and Class Members to act upon data security warnings and alerts in a timely fashion.

399. Defendant had, and continues to have, a duty to timely disclose that Plaintiffs and Class Members' Private Information within its possession was compromised and precisely the types of information that were compromised.

400. Defendant owes a duty of care to Plaintiffs and Class Members to provide data security consistent with industry standards, applicable standards of care from statutory authority like Section 5 of the FTC Act, HIPAA, and other requirements discussed herein, and to ensure that its systems and networks, and the personnel responsible for them, adequately protected individuals' Private Information.

401. Defendant's duty of care to use reasonable security measures arose as a result of the special relationship that existed between Defendant and its patients. Defendant is in a position to ensure that their systems were sufficient to protect against the foreseeable risk of harm to Plaintiffs and Class Members from a data breach.

402. Defendant's duty to use reasonable care in protecting confidential data arose not only as a result of the statutes and regulations described above, but also because Defendant is bound by industry standards to protect confidential Private Information.

403.     Defendant has a common law duty to prevent foreseeable harm to others. This duty existed because Plaintiffs and Class Members were the foreseeable and probable victims of any inadequate security practices on the part of Defendant. By collecting and storing valuable Private Information that is routinely targeted by criminals for unauthorized access, Defendant is obligated to act with reasonable care to protect against these foreseeable threats.

404.     Defendant breached these duties by failing to exercise reasonable care in safeguarding and protecting Plaintiffs' and Class Members' Private Information.

405.     The specific negligent acts and omissions committed by Defendant include, but are not limited to, the following:

     a. Failing to adopt, implement, and maintain adequate security measures to safeguard Plaintiffs' and Class Members' Private Information;

     b. Failing to adequately monitor the security of their networks and systems and to identify reasonably foreseeable internal and external risks to the security, confidentiality, and integrity of consumer information; and

     c. Failing to periodically ensure that its computer systems and networks had plans in place to maintain reasonable data security safeguards.

     d. Failing to detect the breach at the time it began or within a reasonable time thereafter; and

     e. Failing to follow its own privacy policies and practices published to its patients.

406.     Further, Defendant's violation of federal statutes and other applicable laws also constitutes negligence *per se*. Specifically, as described herein, Defendant violated the FTCA and HIPAA.

407.     Section 5 of the FTC Act, 15 U.S.C. 45, prohibits "unfair . . . practices in or affecting commerce" including, as interpreted and enforced by the FTC, the unfair act or practice by Defendant of failing to use reasonable measures to protect Plaintiffs' and Class Members'

Private Information. Various FTC publications and orders also form the basis of Defendant's standard of care.

408.    Defendant violated Section 5 of the FTC Act (and similar state statutes) by failing to use reasonable measures to protect Plaintiffs' and Class Members' Private Information and by failing to comply with industry standards.

409.    Defendant's conduct was particularly unreasonable given the nature and amount of Private Information obtained and stored and the foreseeable consequences of a data breach on Defendant's systems.

410.    Moreover, the harm that has occurred is the type of harm the FTC Act (and similar state statutes) was intended to guard against. Indeed, the FTC has pursued over fifty enforcement actions against businesses which, as a result of their failure to employ reasonable data security measures and avoid unfair and deceptive practices, caused the same harm suffered by Plaintiffs and Class Members.

411.    Further, under HIPAA, 42 U.S.C. § 1302d. et. seq., Defendant has a duty to implement reasonable safeguards to protect Class Members' Private Information.

412.    Pursuant to HIPAA, Defendant had a duty to render the electronic PHI it maintained unusable, unreadable, or indecipherable to unauthorized individuals, as specified in the HIPAA Security Rule by "the use of an algorithmic process to transform data into a form in which there is a low probability of assigning meaning without use of a confidential process or key." See definition of encryption at 45 C.F.R. § 164.304.

413.    Defendant, through its actions and/or omissions, unlawfully breached its duties to Plaintiffs and Class Members by failing to exercise reasonable care in protecting and safeguarding Plaintiffs' and Class Members' Private Information within Defendant's possession.

414. Defendant, through its actions and/or omissions, unlawfully breached its duties to Plaintiffs and Class Members by failing to have appropriate procedures in place to detect and prevent the dissemination of Plaintiffs' and Class Members' Private Information.

415. Defendant, through its actions and/or omissions, unlawfully breached its duty to timely disclose to Plaintiffs and Class Members that the Private Information within Defendant's possession might have been compromised and precisely the type of information compromised.

416. It was foreseeable that Defendant's failure to use reasonable measures to protect Plaintiffs' and Class Members' Private Information would result in injury to Plaintiffs and Class Members. Further, the breach of security was reasonably foreseeable given the known high frequency of cyberattacks and data breaches.

417. It was foreseeable that the failure to adequately safeguard Plaintiffs' and Class Members' Private Information would result in injuries to Plaintiffs and Class Members.

418. Defendant's breach of duties owed to Plaintiffs and Class Members caused Plaintiffs' and Class Members' Private Information to be compromised.

419. But for Defendant's negligent conduct and breach of the above-described duties owed to Plaintiffs and Class Members, their Private Information would not have been compromised.

420. As a result of Defendant's failure to timely notify Plaintiffs and Class Members that their Private Information had been compromised, Plaintiffs and Class Members are unable to take the necessary precautions to mitigate damages by preventing future fraud.

421. As a result of Defendant's negligence, Plaintiffs and Class Members are in danger of imminent harm in that their Private Information, which is still in the possession of third parties, will be used for fraudulent purposes, and Plaintiffs and Class Members have and will suffer

damages including: a substantial increase in the likelihood of identity theft; the compromise, publication, and theft of their personal information; loss of time and costs associated with the prevention, detection, and recovery from unauthorized use of their personal information; the continued risk to their personal information; future costs in terms of time, effort, and money that will be required to prevent, detect, and repair the impact of the personal information compromised as a result of the Data Breach; anxiety, stress, sleep disruption, fear, and frustration arising from loss of privacy; and overpayment for the services or products that were received without adequate data security.

<div align="center">

**COUNT II**
**NEGLIGENCE *PER SE***
**(On Behalf of Plaintiffs and the Class)**

</div>

422.    Plaintiffs re-allege and incorporate by reference all of the allegations contained in paragraphs 1 through 392, as if fully set forth herein.

423.    Under the FTC Act, 15 U.S.C. § 45, Defendant had a duty to use fair and adequate computer systems and data security practices to safeguard Plaintiffs' and Class Members' Private Information.

424.    Section 5 of the FTC Act prohibits "unfair . . . practices in or affecting commerce," including, as interpreted and enforced by the FTC, the unfair act or practice by businesses, such as Defendant, of failing to use reasonable measures to protect the Private Information entrusted to it. The FTC publications and orders promulgated pursuant to the FTC Act also form part of the basis of Defendant's duty to protect Plaintiffs' and the Class Members' sensitive Private Information.

425.    Defendant breached its respective duties to Plaintiffs and Class Members under the FTC Act by failing to provide fair, reasonable, or adequate computer systems and data security

practices to safeguard Private Information.

426.    Defendant violated its duty under Section 5 of the FTC Act by failing to use reasonable measures to protect Private Information and not complying with applicable industry standards as described in detail herein. Defendant's conduct was particularly unreasonable given the nature and amount of Private Information Defendant had collected and stored and the foreseeable consequences of a data breach, including, specifically, the immense damages that would result to individuals in the event of a breach, which ultimately came to pass.

427.    The harm that has occurred is the type of harm the FTC Act is intended to guard against. Indeed, the FTC has pursued numerous enforcement actions against businesses that, because of their failure to employ reasonable data security measures and avoid unfair and deceptive practices, caused the same harm as that suffered by Plaintiffs and members of the Class.

428.    But for Defendant's wrongful and negligent breach of its duties owed, Plaintiffs and Class Members would not have been injured.

429.    The injury and harm suffered by Plaintiffs and Class Members was the reasonably foreseeable result of Defendant's breach of its duties. Defendant knew or should have known that Defendant was failing to meet its duties and that its breach would cause Plaintiffs and members of the Class to suffer the foreseeable harms associated with the exposure of their Private Information.

430.    Similarly, under HIPAA, Defendant had a duty to follow HIPAA standards for data privacy and security to protect Plaintiffs' and Class Members' PHI and provide them prompt and accurate notice regarding any breach of their PHI.

431.    Further, under HIPAA, 42 U.S.C. § 1302d. *et seq.*, Defendant has a duty to implement reasonable safeguards to protect Class Members' Private Information.

432.	Pursuant to HIPAA, Defendant had a duty to render the electronic PHI it maintained unusable, unreadable, or indecipherable to unauthorized individuals, as specified in the HIPAA Security Rule by "the use of an algorithmic process to transform data into a form in which there is a low probability of assigning meaning without use of a confidential process or key." See definition of encryption at 45 C.F.R. § 164.304.

433.	Defendant violated its duty under HIPAA by failing to use reasonable measures to protect its PHI and by not complying with applicable regulations detailed *supra*. Defendant's conduct was particularly unreasonable given the nature and amount of PHI that Defendant collected and stored and the foreseeable consequences of a data breach, including, specifically, the immense damages that would result to individuals in the event of a breach, which ultimately came to pass.

434.	Defendant's various violations and its failure to comply with applicable laws and regulations, namely the FTC Act and HIPAA, constitutes negligence *per se*.

435.	As a direct and proximate result of Defendant's negligence *per se*, Plaintiffs and Class Members have suffered and will continue to suffer numerous injuries (as detailed *supra*).

<u>COUNT III</u>
**BREACH OF IMPLIED CONTRACT**
**(On Behalf of Plaintiffs and the Class)**

436.	Plaintiffs re-allege and incorporate by reference all of the allegations contained in paragraphs 1 through 392, as if fully set forth herein.

437.	Plaintiffs and the Class were required to deliver their Private Information to Defendant as part of the process of obtaining treatment and services provided by Defendant. Further, Plaintiffs and the Class paid money, or money was paid on their behalf, in exchange for services.

438.     Defendant solicited, offered, and invited Plaintiffs and Class members to provide their Private Information as part of Defendant's regular business practices. Plaintiffs and Class Members accepted Defendant's offer and provided their Private Information to Defendant.

439.     Plaintiffs and Class Members entered into implied contracts with Defendant under which Defendant agreed to safeguard and protect such information and to timely and accurately notify Plaintiffs and Class Members if and when their data had been breached and compromised. Each such contractual relationship imposed on Defendant an implied covenant of good faith and fair dealing by which Defendant was required to perform its obligations and manage Plaintiffs' and Class Members' data in a manner which comported with the reasonable expectations of privacy and protection attendant to entrusting such data to Defendant.

440.     In providing their Private Information, Plaintiffs and Class Members entered into an implied contract with Defendant. Pursuant to these implied contracts, Plaintiffs and the Class understood that Defendant, in receiving such data, (1) provide services to Plaintiffs and Class Members, (2) take reasonable measures to safeguard Plaintiffs' and the other Class Members' Private Information, (3) provide prompt and adequate notice of all unauthorized access and/or theft of their Private information, and (4) protect Plaintiffs' and Class Members' Private Information in compliance with federal and state laws and regulations and industry standards.

441.     In delivering their Private Information to Defendant, Plaintiffs and Class Members intended and understood that Defendant would adequately safeguard that data.

442.     Plaintiffs and the Class Members would not have entrusted their Private Information to Defendant in the absence of such an implied contract.

443.     Plaintiffs and Class Members reasonably understood that a portion of the payment they provided to Defendant would be used to pay for adequate security measures.

444.     Defendant accepted possession of Plaintiffs' and Class Members' Private Information.

445.     Had Defendant disclosed to Plaintiffs and Class Members that Defendant did not have adequate computer systems and security practices to secure patients' Private Information, Plaintiffs and members of the Class would not have provided their Private Information to Defendant.

446.     Defendant recognized that patients' Private Information is highly sensitive and must be protected, and that this protection was of material importance as part of the bargain to Plaintiffs and Class Members.

447.     Plaintiffs and Class Members fully performed their obligations under the implied contracts with Defendant.

448.     Defendant breached the implied contract with Plaintiffs and Class Members by failing to take reasonable measures to safeguard its data.

449.     Defendant breached the implied contract with Plaintiffs and Class Members by failing to promptly notify them of the access to and exfiltration of their Private Information.

450.     As a direct and proximate result of the breach of the contractual duties, Plaintiffs and Class Members have suffered actual, concrete, and imminent injuries. The injuries suffered by Plaintiffs and the Class Members include: (a) the invasion of privacy; (b) the compromise, disclosure, theft, and unauthorized use of Plaintiffs' and Class Members' Private Information; (c) economic costs associated with the time spent to detect and prevent identity theft, including loss of productivity; (d) monetary costs associated with the detection and prevention of identity theft; (e) economic costs, including time and money, related to incidents of actual identity theft; (f) the emotional distress, fear, anxiety, nuisance and annoyance of dealing related to the theft and

90

compromise of their Private Information; (g) the diminution in the value of the services bargained for as Plaintiffs and Class Members were deprived of the data protection and security that Defendant promised when Plaintiffs and the proposed class entrusted Defendant with their Private Information; and (h) the continued and substantial risk to Plaintiffs' and Class Members' Private Information, which remains in the Defendant's possession with inadequate measures to protect Plaintiffs' and Class Members' Private Information.

## COUNT IV
## UNJUST ENRICHMENT
### (On Behalf of Plaintiffs and the Class)

451.    Plaintiffs re-allege and incorporate by reference all of the allegations contained in paragraphs 1 through 392, as if fully set forth herein.

452.    Upon information and belief, Defendant funds its data security measures entirely from its general revenues, including from payments made by and/or on behalf of its patients and clients, including Plaintiffs and Class Members, in exchange for services, for which Defendant collected and maintained Plaintiff's and Class Members' Private Information.

453.    As such, Plaintiffs and Class Members conferred a monetary benefit on Defendant, by providing Defendant with their valuable Private Information as a portion of value and monies derived from Plaintiffs and Class Members is to be used to provide a reasonable level of data security, and the amount of the portion of each made that is allocated to data security is known to Defendant.

454.    Defendant enriched itself by saving the costs it reasonably should have expended on data security measures to secure Plaintiffs' and Class Members' Private Information.

455.    Instead of providing a reasonable level of security that would have prevented the Data Breach, Defendant instead calculated to avoid its data security obligations at the expense of

Plaintiffs and Class Members by utilizing cheaper, ineffective security measures. Plaintiffs and Class Members, on the other hand, suffered as a direct and proximate result of Defendant's failure to provide the requisite security.

456. Under the principles of equity and good conscience, Defendant should not be permitted to retain the monetary value of the benefit belonging to Plaintiffs and Class Members, because Defendant's failed to implement appropriate data management and security measures that are mandated by industry standards.

457. Defendant acquired the monetary benefit and Private Information through inequitable means in that they failed to disclose the inadequate security practices previously alleged.

458. If Plaintiffs and Class Members knew that Defendant had not secured their Private Information, they would not have agreed to provide their Private Information to Defendant.

459. Plaintiffs and Class Members have no adequate remedy at law.

460. As a direct and proximate result of Defendant's conduct, Plaintiffs and Class Members have suffered and will suffer injury, including but not limited to: (i) actual identity theft; (ii) the loss of the opportunity how their Private Information is used; (iii) the compromise, publication, and/or theft of their Private Information; (iv) out-of-pocket expenses associated with the prevention, detection, and recovery from identity theft, and/or unauthorized use of their Private Information; (v) lost opportunity costs associated with effort expended and the loss of productivity addressing and attempting to mitigate the actual and future consequences of the Data Breach, including but not limited to efforts spent researching how to prevent, detect, contest, and recover from identity theft; (vi) the continued risk to their Private Information, which remain in Defendant's possession and is subject to further unauthorized disclosures so long as Defendant

fails to undertake appropriate and adequate measures to protect Private Information in its possession; and (vii) future costs in terms of time, effort, and money that will be expended to prevent, detect, contest, and repair the impact of the Private Information compromised as a result of the Data Breach for the remainder of the lives of Plaintiffs and Class Members.

461. As a direct and proximate result of Defendant's conduct, Plaintiffs and Class Members have suffered and will continue to suffer other forms of injury and/or harm.

462. Defendant should be compelled to disgorge into a common fund or constructive trust, for the benefit of Plaintiffs and Class Members, proceeds it unjustly received from them.

**COUNT V**
**INVASION OF PRIVACY: INTRUSION UPON SECLUSION**
**& PUBLIC DISCLOSURE OF PRIVATE FACTS**
**(On Behalf of Plaintiffs and the Class)**

463. Plaintiffs re-allege and incorporate by reference all of the allegations contained in paragraphs 1 through 392, as if fully set forth herein.

464. Plaintiffs and the Class had a legitimate expectation of privacy regarding their highly sensitive and confidential Private Information and were accordingly entitled to the protection of this information against disclosure to unauthorized third parties.

465. Plaintiffs and Class Members successfully took reasonable and appropriate steps to keep their Private Information confidential from the public.

466. Defendant owed a duty to its patients, including Plaintiffs and the Class, to keep this information confidential.

467. The unauthorized acquisition (i.e., theft) by a third party of Plaintiffs' and Class Members' Private Information is highly offensive to a reasonable person.

468. The intrusion was into a place or thing which was private and entitled to be private. Plaintiffs and the Class disclosed their sensitive and confidential information to Defendant in order to receive services, but they did so privately, with the intention that their information would be kept confidential and protected from unauthorized disclosure. Plaintiffs and the Class were reasonable in their belief that such information would be kept private and would not be disclosed without their authorization.

469. Defendant's conduct also represents a public disclosure of private facts in that the disclosure was made to cybercriminals—individuals in a special relationship with Plaintiffs and the proposed Class in that they are the exact group from whom the expected cybersecurity measures are intended to protect Plaintiffs and the proposed Class.

470. The Data Breach constitutes an intentional interference with Plaintiffs' and the Class's interest in solitude or seclusion, either as to their person or as to their private affairs or concerns, of a kind that would be highly offensive to a reasonable person.

471. Defendant acted with a knowing state of mind when it permitted the Data Breach because it knew its information security practices were inadequate.

472. Defendant acted with a knowing state of mind when it failed to notify Plaintiffs and the Class in a timely fashion about the Data Breach, thereby materially impairing their mitigation efforts.

473. By intentionally failing to keep Plaintiffs' and Class Members' Private Information safe, and by intentionally misusing and/or disclosing said information to unauthorized parties for unauthorized use, Defendant intentionally invaded Plaintiffs' and Class Members' privacy by:

a. Intentionally and substantially intruding into Plaintiffs' and Class Members' private affairs in a manner that identifies Plaintiffs and Class Members and that would be highly offensive and objectionable to an ordinary person;

b. Intentionally publicizing private facts about Plaintiffs and Class Members, which is highly offensive and objectionable to an ordinary person; and

c. Intentionally causing anguish or suffering to Plaintiffs and Class Members.

474. As the Restatement explains, as used throughout the Restatement of Torts, intent "has reference to the consequences of an act rather than the act itself." Restatement (Second) of Torts § 8A, cmt. A (1964). "Intent is not, however, limited to consequences which are desired. If the actor knows that the consequences are certain, or substantially certain, to result from her act, and still goes ahead, she is treated by the law as if she had in fact desired to produce the result." *Id.* cmt. B.

475. Indeed, given the foreseeability of the harms inherent in data breaches and the ubiquitous nature of data breaches, Defendant was substantially certain that its failure to implement reasonable cybersecurity standards would lead to an invasion of Plaintiffs' privacy.

476. Acting with knowledge, Defendant had notice and knew that its inadequate cybersecurity practices would cause injury to Plaintiffs and the Class.

477. As a proximate result of Defendant's acts and omissions, the Private Information of Plaintiffs and the Class was stolen by a third party and is now available for disclosure and redisclosure without authorization, causing Plaintiffs and the Class to suffer damages.

478. Unless and until enjoined and restrained by order of this Court, Defendant's wrongful conduct will continue to cause great and irreparable injury to Plaintiffs and the Class

because their Private Information is still maintained by Defendant with its inadequate cybersecurity system and policies.

479.     Plaintiffs and the Class have no adequate remedy at law for the injuries relating to Defendant's continued possession of their sensitive and confidential records. A judgment for monetary damages will not end Defendant's inability to safeguard the Private Information of Plaintiffs and the Class.

480.     In addition to injunctive relief, Plaintiffs, on behalf of themselves and the other members of the Class, also seek compensatory damages for Defendant's invasion of privacy, which includes the value of the privacy interest invaded by Defendant, the costs of future monitoring of their credit history for identity theft and fraud, plus prejudgment interest and costs.

**COUNT VI**
**BREACH OF FIDUCIARY DUTY**
**(On Behalf of Plaintiffs and the Class)**

481.     Plaintiffs re-allege and incorporate by reference all of the allegations contained in paragraphs 1 through 392, as if fully set forth herein.

482.     In light of the special relationship between Defendant and Plaintiffs and Class Members, whereby Defendant became guardian of Plaintiffs' and Class Members' Private Information and was a medical provider to Plaintiffs and Class Members, Defendant became a fiduciary by its undertaking and guardianship of the Private Information, (1) to act primarily for Plaintiffs and Class Members; (2) for the safeguarding of their Private Information; (3) to timely notify Plaintiffs and Class Members of a Data Breach's occurrence and disclosure; and (4) to maintain complete and accurate records of what information (and where) Defendant did and does store.

483. Defendant has a fiduciary duty to act for the benefit of Plaintiffs and Class Members upon matters within the scope of Defendant's relationship with its patients, in particular, to keep secure their Private Information.

484. Defendant has a fiduciary duty to act for the benefit of Plaintiffs and Class Members because of the high degree of trust and confidence inherent to the nature of the relationship between Plaintiffs and Class Members on the one hand and Defendant on the other, including with respect to their Private Information.

485. Defendant breached its fiduciary duties to Plaintiffs and Class Members by failing to diligently discover, investigate, and give notice of the Data Breach in a reasonable and practicable period of time.

486. Defendant breached its fiduciary duties to Plaintiffs and Class Members by failing to encrypt and otherwise protect the integrity of the systems containing Plaintiffs' and Class Members' Private Information.

487. Defendant breached its fiduciary duties owed to Plaintiffs and Class Members by failing to timely notify and/or warn Plaintiffs and Class Members of the Data Breach.

488. Defendant breached its fiduciary duties to Plaintiffs and Class Members by otherwise failing to safeguard Plaintiffs' and Class Members' Private Information.

489. As a direct and proximate result of Defendant's breaches of its fiduciary duties, Plaintiffs and Class Members have suffered and will suffer injury, including but not limited to: (i) invasion of privacy; (ii) theft of their Private Information; (iii) lost or diminished value of Private Information; (iv) lost time and opportunity costs associated with attempting to mitigate the actual consequences of the Data Breach; (v) loss of benefit of the bargain; (vi) lost opportunity costs associated with attempting to mitigate the actual consequences of the Data Breach; (vii) nominal

damages; and (viii) the continued and certainly increased risk to their Private Information, which: (a) remains unencrypted and available for unauthorized third parties to access and abuse; and (b) remains backed up in Defendant's possession and is subject to further unauthorized disclosures so long as Defendant fails to undertake appropriate and adequate measures to protect the Private Information.

<div align="center">

**COUNT VII**
**VIOLATION OF NORTH CAROLINA UNFAIR AND DECEPTIVE TRADE PRACTICES ACT**
**(On Behalf of Plaintiffs and the Class)**

</div>

490.    Plaintiffs re-allege and incorporate by reference all of the allegations contained in paragraphs 1 through 392, as if fully set forth herein.

491.    The North Carolina Unfair and Deceptive Trade Practices Act provides that "[u]nfair methods of competition in or affecting commerce, and unfair or deceptive acts or practices in or affecting commerce, are declared unlawful." G.S. § 75-1.1.

492.    Defendant violated the North Carolina Unfair and Deceptive Trade Practices Act by, inter alia:

a.    failing to implement and maintain reasonable security and privacy measures to protect Plaintiffs' and Class Members' Private Information, which was a direct and proximate cause of the Data Breach;

b.    failing to identify foreseeable security and privacy risks, remediate identified security and privacy risks, and adequately improve security and privacy measures following previous cybersecurity incidents, which was a direct and proximate cause of the Data Breach;

c.  failing to comply with common law and statutory duties pertaining to the security and privacy of Plaintiffs' and Class Members' Private Information, including duties imposed by the FTC Act, 15 U.S.C. § 45, the FCRA, 15 U.S.C. § 1681e, and the GLBA, 15 U.S.C. § 6801, *et seq.*, which was a direct and proximate cause of the Data Breach;

d.  omitting, suppressing, and concealing the material fact that it did not reasonably or adequately secure Plaintiffs' and Class Members' Private Information; and

e.  omitting, suppressing, and concealing the material fact that it did not comply with common law and statutory duties pertaining to the security and privacy of Plaintiffs' and Class Members' Private Information, including duties imposed by the FTC Act, 15 U.S.C. § 45, the FCRA, 15 U.S.C. § 1681e, and the GLBA, 15 U.S.C. § 6801, et seq.

493.  Defendant's omissions were material because they were likely to deceive reasonable consumers about the adequacy of Defendant's data security and ability to protect the confidentiality of their Private Information.

494.  Defendant intended to mislead Plaintiffs and Class Members and induce them to rely on its omissions.

495.  Had Defendant disclosed to Plaintiffs and Class Members that its data systems were not secure—and thus vulnerable to attack—Defendant would have been unable to continue in business, and it would have been forced to adopt reasonable data security measures and comply with the law. Defendant accepted the Private Information that Plaintiffs and Class Members entrusted to it while keeping the inadequate state of its security controls secret from the public.

Accordingly, Plaintiffs and Class Members acted reasonably in relying on Defendant's omissions, the truth of which they could not have discovered through reasonable investigation.

496. Defendant acted intentionally, knowingly, maliciously, and recklessly disregarded Plaintiffs' and Class Members' rights.

497. As a direct and proximate result of Defendant's unfair and deceptive acts and practices, Plaintiffs and Class Members have suffered and will continue to suffer injury, ascertainable losses of money or property, and monetary and non-monetary damages, including from fraud and identity theft; time and expenses related to monitoring their financial accounts for fraudulent activity; an increased, imminent risk of fraud and identity theft; and loss of value of their Private Information.

498. And, on information and belief, Plaintiffs' Private Information has already been published—or will be published imminently—by cybercriminals on the dark web.

499. Plaintiffs and Class Members seek all monetary and non-monetary relief allowed by law.

## **PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiffs, on behalf of themselves and Class Members, request judgment against Defendant and that the Court grant the following:

A. For an Order certifying the Class and appointing Plaintiffs and their Counsel to represent the Class;

B. For equitable relief, enjoining Defendant from engaging in the wrongful conduct complained of herein pertaining to the misuse and/or disclosure of the Private Information of Plaintiffs and Class Members;

C. For injunctive relief requested by Plaintiffs, including but not limited to, injunctive

and other equitable relief as is necessary to protect the interests of Plaintiffs and Class Members, including but not limited to an order:

i. prohibiting Defendant from engaging in the wrongful and unlawful acts described herein;

ii. requiring Defendant to protect, including through encryption, all data collected through the course of its business in accordance with all applicable regulations, industry standards, and federal, state or local laws;

iii. requiring Defendant to delete, destroy, and purge the personal identifying information of Plaintiffs and Class Members unless Defendant can provide to the Court reasonable justification for the retention and use of such information when weighed against the privacy interests of Plaintiffs and Class Members;

iv. requiring Defendant to provide out-of-pocket expenses associated with the prevention, detection, and recovery from identity theft, tax fraud, and/or unauthorized use of their Private Information for Plaintiffs' and Class Members' respective lifetimes;

v. requiring Defendant to implement and maintain a comprehensive Information Security Program designed to protect the confidentiality and integrity of the Private Information of Plaintiffs and Class Members;

vi. prohibiting Defendant from maintaining the Private Information of Plaintiffs and Class Members on a cloud-based database;

vii. requiring Defendant to engage independent third-party security auditors/penetration testers as well as internal security personnel to conduct testing, including simulated attacks, penetration tests, and audits on Defendant's

systems on a periodic basis, and ordering Defendant to promptly correct any problems or issues detected by such third-party security auditors;

viii. requiring Defendant to engage independent third-party security auditors and internal personnel to run automated security monitoring;

ix. requiring Defendant to audit, test, and train its security personnel regarding any new or modified procedures;

x. requiring Defendant to segment data by, among other things, creating firewalls and controls so that if one area of Defendant's network is compromised, hackers cannot gain access to portions of Defendant's systems;

xi. requiring Defendant to conduct regular database scanning and securing checks;

xii. requiring Defendant to establish an information security training program that includes at least annual information security training for all employees, with additional training to be provided as appropriate based upon the employees' respective responsibilities with handling personal identifying information, as well as protecting the personal identifying information of Plaintiffs and Class Members;

xiii. requiring Defendant to routinely and continually conduct internal training and education, and on an annual basis to inform internal security personnel how to identify and contain a breach when it occurs and what to do in response to a breach;

xiv. requiring Defendant to implement a system of tests to assess its respective employees' knowledge of the education programs discussed in the preceding subparagraphs, as well as randomly and periodically testing employees'

compliance with Defendant's policies, programs, and systems for protecting personal identifying information;

xv. requiring Defendant to implement, maintain, regularly review, and revise as necessary a threat management program designed to appropriately monitor Defendant's information networks for threats, both internal and external, and assess whether monitoring tools are appropriately configured, tested, and updated;

xvi. requiring Defendant to meaningfully educate all Class Members about the threats that they face as a result of the loss of their confidential personal identifying information to third parties, as well as the steps affected individuals must take to protect themselves;

xvii. requiring Defendant to implement logging and monitoring programs sufficient to track traffic to and from Defendant's servers; and

xviii. for a period of 10 years, appointing a qualified and independent third-party assessor to conduct a SOC 2 Type 2 attestation on an annual basis to evaluate Defendant's compliance with the terms of the Court's final judgment, to provide such report to the Court and to counsel for the class, and to report any deficiencies with compliance of the Court's final judgment;

D. For an award of damages, including actual, nominal, statutory, consequential, and punitive damages, as allowed by law in an amount to be determined, including compensation for the time Plaintiffs and the Class have had to spend responding to the subject Data Breach at Defendant's direction and because of its failures;

E. For an award of attorneys' fees, costs, and litigation expenses, as allowed by law;

F.     For prejudgment interest on all amounts awarded; and

G.     Such other and further relief as this Court may deem just and proper.

## **JURY TRIAL DEMANDED**

Plaintiffs hereby demand a trial by jury on all claims so triable.


Dated: January 22, 2026                    Respectfully Submitted,

                                           */s/David M. Wilkerson*
                                           David M. Wilkerson
                                           NC Bar No.: 35742
                                           **WILKERSON JUSTUS PLLC**
                                           9 SW Pack Square, Suite 301
                                           Asheville, NC 28801
                                           Tel: (828) 316-6902
                                           dwilkerson@wilkersonjustus.com

                                           *Liaison Counsel for Plaintiffs and the Putative
                                           Class*

                                           Casondra Turner*
                                           **MILBERG, PLLC**
                                           260 Peachtree Street NW, Suite 2200
                                           Atlanta, GA 30303
                                           Tel: (866) 252-0878
                                           cturner@milberg.com

                                           Amber L. Schubert*
                                           **SCHUBERT JONCKHEER & KOLBE LLP**
                                           2001 Union St, Ste 200
                                           San Francisco, CA 94123
                                           Tel: 415-788-4220
                                           aschubert@sjk.law

                                           Sabita J. Soneji*
                                           **TYCKO & ZAVAREEI LLP**
                                           1970 Broadway, Suite 1070
                                           Oakland, California 94612
                                           Tel: (510) 254-6808
                                           ssoneji@tzlegal.com

Caroline Herter*
**KOPELOWITZ OSTROW P.A.**
1 W Las Olas Blvd, Suite 500
Fort Lauderdale, FL 33301
Tel: (954) 525-4100
herter@kolawyers.com

Laura Van Note, Esq. (CA S.B. #310160)*
**COLE & VAN NOTE**
555 12th Street, Suite 2100
Oakland, California 94607
Tel: (510) 891-9800
Fax: (510) 891-7030
lvn@colevannote.com

*Co-Lead Counsel*

*\*Pro hac vice application forthcoming*

## CERTIFICATE OF SERVICE

I certify that a copy of the above was served on January 22, 2026 to all counsel of record through the court's electronic filing system at their email address of record.

/s/David M. Wilkerson
David M. Wilkerson

# EXHIBIT A



**GOSHEN**

Secure Processing Center
P.O. Box 3826
Suwanee, GA 30024



133 1 54506 ******************AUTO**5-DIGIT 27534
Arthur Maxwell
302 Goldleaf Dr
Goldsboro, NC 27534-8836
 իդ||իսաս|աս|||||իս|||իս| դի|ս|իս||||||||ս|իդս|

September 17, 2025

Re: Notice of Data Security Incident

Dear Arthur Maxwell:

Goshen Medical Center is writing to notify you of a data security incident which may have involved your personal information. We take the privacy and security of all information within our possession very seriously. Please read this letter carefully as it contains information regarding the incident and information about steps that you can take to help protect your information.

**What Happened?** On March 4, 2025, we detected suspicious activity within our network. We promptly initiated an investigation of the matter and engaged cybersecurity specialists to assist with the incident response. As a result, we determined that certain files may have been accessed or acquired without authorization on February 15, 2025. We then undertook a comprehensive review of the affected data and, on or about September 12, 2025, learned that some personal health information was involved. Please note, we have no evidence of the misuse, or attempted misuse, of any potentially impacted information.

**What Information was Involved?** The information may have included your name as well as your name, address, date of birth, Social Security number, driver's license number, and medical record number.

**What We Are Doing.** As soon as we discovered the incident, we took the steps described above. We also implemented additional measures to reduce the risk of a similar incident occurring in the future.

We are also offering you the ability to enroll in 12 months of complimentary credit monitoring and identity protection services through Epiq Privacy Solutions ID Standard, which provides credit monitoring through Equifax, ID Restoration services, and dark web monitoring. The deadline for enrolling in these services is **December 31, 2025.**

**What You Can Do.** You can follow the recommendations on the following page to help protect your personal information. You can also enroll in the identity protection services, which are offered at no cost to you.

**How To Enroll:**
1) Visit www.privacysolutionsid.com and click "Activate Account"
2) Enter the following activation code, **ABCU-5378-3355-4501-9768** and complete the enrollment form
3) Complete the identity verification process
4) You will receive a separate email from noreply@privacysolutions.com confirming your account has been set up successfully and will include an Access Your Account link in the body of the email that will direct you to the log-in page



**GOSHEN**
MEDICAL CENTER

Secure Processing Center
P.O. Box 3826
Suwanee, GA 30024

438 1 167804 ********************AUTO**5-DIGIT 28525
Barbara White
2869 Tram Rd
Deep Run, NC 28525-9472

September 17, 2025

Re: Notice of Data Security Incident

Dear Barbara White:

Goshen Medical Center is writing to notify you of a data security incident which may have involved your personal information. We take the privacy and security of all information within our possession very seriously. Please read this letter carefully as it contains information regarding the incident and information about steps that you can take to help protect your information.

**What Happened?**  On March 4, 2025, we detected suspicious activity within our network. We promptly initiated an investigation of the matter and engaged cybersecurity specialists to assist with the incident response. As a result, we determined that certain files may have been accessed or acquired without authorization on February 15, 2025. We then undertook a comprehensive review of the affected data and, on or about September 12, 2025, learned that some personal health information was involved. Please note, we have no evidence of the misuse, or attempted misuse, of any potentially impacted information.

**What Information was Involved?**  The information may have included your name as well as your name, address, date of birth, Social Security number, driver's license number, and medical record number.

**What We Are Doing.**  As soon as we discovered the incident, we took the steps described above. We also implemented additional measures to reduce the risk of a similar incident occurring in the future.

We are also offering you the ability to enroll in 12 months of complimentary credit monitoring and identity protection services through Epiq Privacy Solutions ID Standard, which provides credit monitoring through Equifax, ID Restoration services, and dark web monitoring. The deadline for enrolling in these services is **December 31, 2025**.

**What You Can Do.**  You can follow the recommendations on the following page to help protect your personal information. You can also enroll in the identity protection services, which are offered at no cost to you.

**How To Enroll:**
1) Visit www.privacysolutionsid.com and click "Activate Account"
2) Enter the following activation code, **ABCU-9315-4005-4742-1810** and complete the enrollment form
3) Complete the identity verification process
4) You will receive a separate email from noreply@privacysolutions.com confirming your account has been set up successfully and will include an Access Your Account link in the body of the email that will direct you to the log-in page

## Steps You Can Take to Help Protect Your Personal Information

**Review Your Account Statements and Notify Law Enforcement of Suspicious Activity:** As a precautionary measure, we recommend that you remain vigilant by reviewing your account statements and credit reports closely. If you detect any suspicious activity on an account, you should promptly notify the financial institution or company with which the account is maintained. You also should promptly report any fraudulent activity or any suspected incidence of identity theft to proper law enforcement authorities, your state attorney general, and/or the Federal Trade Commission ("FTC").

**Copy of Credit Report:** You may obtain a free copy of your credit report from each of the three major credit reporting agencies once every 12 months by visiting www.annualcreditreport.com, calling toll-free 1-877-322-8228, or by completing an Annual Credit Report Request Form and mailing it to Annual Credit Report Request Service, P.O. Box 105281, Atlanta, GA 30348. You also can contact one of the following three national credit reporting agencies:

| Equifax | Experian | TransUnion |
|---|---|---|
| P.O. Box 105851 | P.O. Box 9532 | P.O. Box 2000 |
| Atlanta, GA 30348 | Allen, TX 75013 | Chester, PA 19016 |
| 1-800-525-6285 | 1-888-397-3742 | 1-833-395-6938 |
| www.equifax.com | www.experian.com | www.transunion.com/get-credit-report |

**Fraud Alert:** You may want to consider placing a fraud alert on your credit report. An initial fraud alert is free and will stay on your credit file for at least one year. The alert informs creditors of possible fraudulent activity within your report and requests that the creditor contact you prior to establishing any accounts in your name. To place a fraud alert on your credit report, contact any of the three credit reporting agencies identified above. Additional information is available at www.annualcreditreport.com. For TransUnion: www.transunion.com/fraud-alerts

**Security Freeze:** You have the right to put a security freeze on your credit file for up to one year at no cost. This will prevent new credit from being opened in your name without the use of a PIN number that is issued to you when you initiate the freeze. A security freeze is designed to prevent potential creditors from accessing your credit report without your consent. As a result, using a security freeze may interfere with or delay your ability to obtain credit. You must separately place a security freeze on your credit file with each credit reporting agency. In order to place a security freeze, you may be required to provide the consumer reporting agency with information that identifies you including your full name, Social Security number, date of birth, current and previous addresses, a copy of your state-issued identification card, and a recent utility bill, bank statement or insurance statement. For TransUnion: www.transunion.com/credit-freeze

**Additional Free Resources:** You can obtain information from the consumer reporting agencies, the FTC, or from your respective state Attorney General about fraud alerts, security freezes, and steps you can take toward preventing identity theft. You may report suspected identity theft to local law enforcement, including to the FTC or to the Attorney General in your state.

**Federal Trade Commission**
600 Pennsylvania Ave. NW
Washington, DC 20580
www.ftc.gov
877-438-4338

**Maryland Attorney General**
200 St. Paul Place
Baltimore, MD 21202
www.marylandattorneygeneral.gov/Pages/CPD
888-743-0023

**Oregon Attorney General**
1162 Court St., NE
Salem, OR 97301
www.doj.state.or.us/consumer-protection
877-877-9392

**California Attorney General**
1300 I Street
Sacramento, CA 95814
www.oag.ca.gov/privacy
800-952-5225

**New York Attorney General**
The Capitol
Albany, NY 12224
800-771-7755
ag.ny.gov

**Rhode Island Attorney General**
150 South Main Street
Providence, RI 02903
www.riag.ri.gov
401-274-4400

---



**GOSHEN**

Square Processing Center
P.O. Box 5826
Suwanee, GA 30024

‖‖‖‖‖‖‖‖‖‖‖‖‖‖‖‖‖‖‖‖‖‖‖‖‖‖‖*****ALL FOR AADC 283

Geoffrey Copious
586 Buckeye Dr
Raeford, NC 28376

September 17, 2025

Re: Notice of Data Security Incident

Dear Geoffrey Copious:

Goshen Medical Center is writing to notify you of a data security incident which may have involved your personal information. We take the privacy and security of all information within our possession very seriously. Please read this letter carefully as it contains information regarding the incident and information about steps that you can take to help protect your information.

**What Happened?** On March 4, 2025, we detected suspicious activity within our network. We promptly initiated an investigation of the matter and engaged cybersecurity specialists to assist with the incident response. As a result, we determined that certain files may have been accessed or acquired without authorization on February 15, 2025. We also undertook a comprehensive review of the affected data and on or about September 12, 2025, learned that some personal health information was involved. Please note, we have no evidence of the misuse, or attempted misuse, of any potentially impacted information.

**What Information was Involved?** The information that may have included your name, address, date of birth, Social Security number, driver's license number, and medical record number.

**What We Are Doing.** As soon as we discovered the incident, we took the steps described above. We also implemented additional measures to reduce the risk of a similar incident occurring in the future.

We are also offering you the ability to enroll in 12 months of complimentary credit monitoring and identity protection services through Epiq Privacy Solutions ID Standard, which provides credit monitoring through Equifax, ID Restoration services, and dark web monitoring. The deadline for enrolling in these services is **December 31, 2025**.

**What You Can Do.** You can follow the recommendations on the following page to help protect your personal information. You can also enroll in the identity protection services, which are offered at no cost to you.

**How To Enroll.**
1) Visit www.privacysolutionsid.com and click "Activate Account"
2) Enter the following activation code, ABCU-3741-7098-1624-4888 and complete the enrollment form
3) Complete the identity verification process
4) You will receive a separate email from notefb@privacysolutions.com confirming your account has been set up successfully and will include an Access Your Account link in the body of the email that will direct you to the log in page



**GOSHEN**
MEDICAL CENTER

Secure Processing Center
P.O. Box 3826
Suwanee, GA 30024



28 1 11640 ••••••••••••••••••••AUTO**5-DIGIT 28328
Veronica Darden
59 Parkview Rd Lot 70
Clinton, NC 28328-3874

September 17, 2025

Re: Notice of Data Security Incident

Dear Veronica Darden:

Goshen Medical Center is writing to notify you of a data security incident which may have involved your personal information. We take the privacy and security of all information within our possession very seriously. Please read this letter carefully as it contains information regarding the incident and information about steps that you can take to help protect your information.

**What Happened?** On March 4, 2025, we detected suspicious activity within our network. We promptly initiated an investigation of the matter and engaged cybersecurity specialists to assist with the incident response. As a result, we determined that certain files may have been accessed or acquired without authorization on February 15, 2025. We then undertook a comprehensive review of the affected data and, on or about September 12, 2025, learned that some personal health information was involved. Please note, we have no evidence of the misuse, or attempted misuse, of any potentially impacted information.

**What Information was Involved?** The information may have included your name as well as your name, address, date of birth, Social Security number, driver's license number, and medical record number.

**What We Are Doing.** As soon as we discovered the incident, we took the steps described above. We also implemented additional measures to reduce the risk of a similar incident occurring in the future.

We are also offering you the ability to enroll in 12 months of complimentary credit monitoring and identity protection services through Epiq Privacy Solutions ID Standard, which provides credit monitoring through Equifax, ID Restoration services, and dark web monitoring. The deadline for enrolling in these services is **December 31, 2025.**

**What You Can Do.** You can follow the recommendations on the following page to help protect your personal information. You can also enroll in the identity protection services, which are offered at no cost to you.

**How To Enroll:**
1) Visit www.privacysolutionsid.com and click "Activate Account"
2) Enter the following activation code, **ABCU-3333-9799-6416-6315** and complete the enrollment form
3) Complete the identity verification process
4) You will receive a separate email from noreply@privacysolutions.com confirming your account has been set up successfully and will include an Access Your Account link in the body of the email that will direct you to the log-in page

**GOSHEN** MEDICAL CENTER

Secure Processing Center
P.O. Box 3826
Suwanee, GA 30024

434 1 1749B6 ********************AUTO**5-DIGIT 28434
Francina Freeman
765 Figure 9 Rd
Council, NC  28434-8521

September 17, 2025

Re: Notice of Data Security Incident

Dear Francina Freeman:

Goshen Medical Center is writing to notify you of a data security incident which may have involved your personal information. We take the privacy and security of all information within our possession very seriously. Please read this letter carefully as it contains information regarding the incident and information about steps that you can take to help protect your information.

**What Happened?**  On March 4, 2025, we detected suspicious activity within our network. We promptly initiated an investigation of the matter and engaged cybersecurity specialists to assist with the incident response. As a result, we determined that certain files may have been accessed or acquired without authorization on February 15, 2025. We then undertook a comprehensive review of the affected data and, on or about September 12, 2025, learned that some personal health information was involved. Please note, we have no evidence of the misuse, or attempted misuse, of any potentially impacted information.

**What Information was Involved?**  The information may have included your name as well as your name, address, date of birth, Social Security number, driver's license number, and medical record number.

**What We Are Doing.**  As soon as we discovered the incident, we took the steps described above. We also implemented additional measures to reduce the risk of a similar incident occurring in the future.

We are also offering you the ability to enroll in 12 months of complimentary credit monitoring and identity protection services through Epiq Privacy Solutions ID Standard, which provides credit monitoring through Equifax, ID Restoration services, and dark web monitoring. The deadline for enrolling in these services is **December 31, 2025**.

**What You Can Do.** You can follow the recommendations on the following page to help protect your personal information. You can also enroll in the identity protection services, which are offered at no cost to you.

**How To Enroll:**
1) Visit www.privacysolutionsid.com and click "Activate Account"
2) Enter the following activation code, **ABCU-2528-3245-2861-8264** and complete the enrollment form
3) Complete the identity verification process
4) You will receive a separate email from noreply@privacysolutions.com confirming your account has been set up successfully and will include an Access Your Account link in the body of the email that will direct you to the log-in page



Secure Processing Center
P.O. Box 3826
Suwanee, GA 30024



469 1 187588 ********************AUTO**5-DIGIT 28472
Saundra Cooper
131 Mill Pond Rd
Whiteville, NC 28472-4434

September 17, 2025

Re: Notice of Data Security Incident

Dear Saundra Cooper:

Goshen Medical Center is writing to notify you of a data security incident which may have involved your personal information. We take the privacy and security of all information within our possession very seriously. Please read this letter carefully as it contains information regarding the incident and information about steps that you can take to help protect your information.

**What Happened?** On March 4, 2025, we detected suspicious activity within our network. We promptly initiated an investigation of the matter and engaged cybersecurity specialists to assist with the incident response. As a result, we determined that certain files may have been accessed or acquired without authorization on February 15, 2025. We then undertook a comprehensive review of the affected data and, on or about September 12, 2025, learned that some personal health information was involved. Please note, we have no evidence of the misuse, or attempted misuse, of any potentially impacted information.

**What Information was Involved?** The information may have included your name as well as your name, address, date of birth, Social Security number, driver's license number, and medical record number.

**What We Are Doing.** As soon as we discovered the incident, we took the steps described above. We also implemented additional measures to reduce the risk of a similar incident occurring in the future.

We are also offering you the ability to enroll in 12 months of complimentary credit monitoring and identity protection services through Epiq Privacy Solutions ID Standard, which provides credit monitoring through Equifax, ID Restoration services, and dark web monitoring. The deadline for enrolling in these services is **December 31, 2025.**

**What You Can Do.** You can follow the recommendations on the following page to help protect your personal information. You can also enroll in the identity protection services, which are offered at no cost to you.

**How To Enroll:**

1) Visit www.privacysolutionsid.com and click "Activate Account"
2) Enter the following activation code, **ABCU-2667-5822-1799-0173** and complete the enrollment form
3) Complete the identity verification process
4) You will receive a separate email from noreply@privacysolutions.com confirming your account has been set up successfully and will include an Access Your Account link in the body of the email that will direct you to the log-in page

Steps You Can Take

Review Your Account Statements and Notify Law Enforcement of Suspicious...

we recommend that ...

5) Enter your log-in credentials
6) You will be directed to your dashboard and activation is complete!

## Epiq Privacy Solutions ID Standard includes:

- **Credit Monitoring with Alerts**
  Monitors your credit file(s) for key changes, with alerts such as credit inquiries, new accounts, and public records.

- **Credit Protection**
  Credit Report Lock/Freeze assists with blocking access to the credit file for the purposes of extending credit (with certain exceptions).

- **Dark Web (lite) Monitoring**
  Monitoring 1 email address, phone, name, DOB, and SSN on the dark web. Includes retrospective report as well as ongoing monitoring.

- **Identity Restoration**
  Dedicated ID restoration specialists who assist with ID theft recovery.

- **Change of Address**
  *Monitors the National Change of Address (NCOA) database and the U.S. Postal Service records to catch unauthorized changes to users' current or past addresses.*

*For More Information.* Further information about how to protect your personal information appears on the following page. *If you have questions or need assistance, please call 877-396-3238, Monday through Friday, 9:00 a.m. to 9:00 p.m. Eastern time. Epiq representatives have been fully versed on the incident and can answer questions or concerns you may have regarding protection of your personal information.*

We take your trust in us and this matter very seriously. We deeply regret any worry or inconvenience that this may cause you.

Sincerely,

Goshen Medical Center
444 S. SW Center Street
Faison, NC 28341

## Steps You Can Take to Help Protect Your Personal Information

**Review Your Account Statements and Notify Law Enforcement of Suspicious Activity:** As a precautionary measure, we recommend that you remain vigilant by reviewing your account statements and credit reports closely. If you detect any suspicious activity on an account, you should promptly notify the financial institution or company with which the account is maintained. You also should promptly report any fraudulent activity or any suspected incidence of identity theft to proper law enforcement authorities, your state attorney general, and/or the Federal Trade Commission (the "FTC").

**Copy of Credit Report:** You may obtain a free copy of your credit report from each of the three major credit reporting agencies once every 12 months by visiting www.annualcreditreport.com/, calling toll-free 1-877-322-8228, or by completing an Annual Credit Report Request Form and mailing it to Annual Credit Report Request Service, P.O. Box 105281, Atlanta, GA 30348. You also can contact one of the following three national credit reporting agencies:

| **Equifax** | **Experian** | **TransUnion** |
|---|---|---|
| P.O. Box 105851 | P.O. Box 9532 | P.O. Box 2000 |
| Atlanta, GA 30348 | Allen, TX 75013 | Chester, PA 19016 |
| 1-800-525-6285 | 1-888-397-3742 | 1-833-799-5355 |
| www.equifax.com | www.experian.com | www.transunion.com/get-credit-report |

**Fraud Alert:** You may want to consider placing a fraud alert on your credit report. An initial fraud alert is free and will stay on your credit file for at least one year. The alert informs creditors of possible fraudulent activity within your report and requests that the creditor contact you prior to establishing any accounts in your name. To place a fraud alert on your credit report, contact any of the three credit reporting agencies identified above. Additional information is available at www.annualcreditreport.com. For TransUnion: www.transunion.com/fraud-alerts.

**Security Freeze:** You have the right to put a security freeze on your credit file for up to one year at no cost. This will prevent new credit from being opened in your name without the use of a PIN number that is issued to you when you initiate the freeze. A security freeze is designed to prevent potential creditors from accessing your credit report without your consent. As a result, using a security freeze may interfere with or delay your ability to obtain credit. You must separately place a security freeze on your credit file with each credit reporting agency. In order to place a security freeze, you may be required to provide the consumer reporting agency with information that identifies you including your full name, Social Security number, date of birth, current and previous addresses, a copy of your state-issued identification card, and a recent utility bill, bank statement or insurance statement. For TransUnion: www.transunion.com/credit-freeze.

**Additional Free Resources:** You can obtain information from the consumer reporting agencies, the FTC, or from your respective state Attorney General about fraud alerts, security freezes, and steps you can take toward preventing identity theft. You may report suspected identity theft to local law enforcement, including to the FTC or to the Attorney General in your state.

**Federal Trade Commission**
600 Pennsylvania Ave, NW
Washington, DC 20580
consumer.ftc.gov
877-438-4338

**California Attorney General**
1300 I Street
Sacramento, CA 95814
www.oag.ca.gov/privacy
800-952-5225

**Maryland Attorney General**
200 St. Paul Place
Baltimore, MD 21202
www.marylandattorneygeneral.gov/Pages/CPD
888-743-0023

**New York Attorney General**
The Capitol
Albany, NY 12224
800-771-7755
ag.ny.gov

**Oregon Attorney General**
1162 Court St., NE
Salem, OR 97301
www.doj.state.or.us/consumer-protection
877-877-9392

**Rhode Island Attorney General**
150 South Main Street
Providence, RI 02903
www.riag.ri.gov
401-274-4400



**Iowa Attorney General**
1305 E. Walnut Street
Des Moines, Iowa 50319
www.iowaattorneygeneral.gov
888-777-4590

**Kentucky Attorney General**
700 Capitol Avenue, Suite 118
Frankfort, Kentucky 40601
www.ag.ky.gov
502-696-5300

**NY Bureau of Internet and Technology**
28 Liberty Street
New York, NY 10005
www.dos.ny.gov/consumerprotection/
212.416.8433

**NC Attorney General**
9001 Mail Service Center
Raleigh, NC 27699
ncdoj.gov/protectingconsumers/
877-566-7226

**Washington D.C. Attorney General**
400 S 6th Street, NW
Washington, DC 20001
oag.dc.gov/consumer-protection
202-442-9828

**You also have certain rights under the Fair Credit Reporting Act (FCRA):** These rights include to know what is in your file; to dispute incomplete or inaccurate information; to have consumer reporting agencies correct or delete inaccurate, incomplete, or unverifiable information; as well as other rights. For more information about the FCRA, and your rights pursuant to the FCRA, please visit www.consumer.ftc.gov/sites/default/files/articles/pdf/pdf-0096-fair-credit-reporting-act.pdf.



**GOSHEN**

Secure Processing Center
P.O. Box 3826
Suwanee, GA 30024

30 1 127M **\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*AUTO\*\*3-DIGIT 28328**
Hope Tucker
1975 Turkey Hwy
Clinton, NC 28328-9618

September 17, 2025

Re: Notice of Data Security Incident

Dear Hope Tucker:

Goshen Medical Center is writing to notify you of a data security incident which may have involved your personal information. We take the privacy and security of all information within our possession very seriously. Please read this letter carefully as it contains information regarding the incident and information about steps that you can take to help protect your information.

**What Happened?**  On March 4, 2025, we detected suspicious activity within our network. We promptly initiated an investigation of the matter and engaged cybersecurity specialists to assist with the incident response. As a result, we determined that certain files may have been accessed or acquired without authorization on February 15, 2025. We then undertook a comprehensive review of the affected data and, on or about September 12, 2025, learned that some personal health information was involved. Please note, we have no evidence of the misuse, or attempted misuse, of any potentially impacted information.

**What Information was Involved?**  The information may have included your name as well as your name, address, date of birth, Social Security number, driver's license number, and medical record number.

**What We Are Doing.**  As soon as we discovered the incident, we took the steps described above. We also implemented additional measures to reduce the risk of a similar incident occurring in the future.

We are also offering you the ability to enroll in 12 months of complimentary credit monitoring and identity protection services through Epiq Privacy Solutions ID Standard, which provides credit monitoring through Equifax, ID Restoration services, and dark web monitoring. The deadline for enrolling in these services is **December 31, 2025.**

**What You Can Do.** You can follow the recommendations on the following page to help protect your personal information. You can also enroll in the identity protection services, which are offered at no cost to you.

**How To Enroll:**
1) Visit www.privacysolutionsid.com and click "Activate Account"
2) Enter the following activation code, **ABCU-9661-1118-1979-1325** and complete the enrollment form
3) Complete the identity verification process
4) You will receive a separate email from noreply@privacysolutions.com confirming your account has been set up successfully and will include an Access Your Account link in the body of the email that will direct you to the log-in page



**GOSHEN**

Secure Processing Center
P.O. Box 3826
Suwanee, GA 30024



49 1 20179 ********************AUTO**5-DIGIT 28528
Jamica Bass
109 Robin Lake Dr
Dudley, NC 28333-9137
հ||լ•••հ||ի••••հ|հ|ահ||ա|ո•||•։||դ|||հ|հ•|••հ••հ|ո|||հ|

September 17, 2025

Re: Notice of Data Security Incident

Dear Jamica Bass:

Goshen Medical Center is writing to notify you of a data security incident which may have involved your personal information. We take the privacy and security of all information within our possession very seriously. Please read this letter carefully as it contains information regarding the incident and information about steps that you can take to help protect your information.

**What Happened?** On March 4, 2025, we detected suspicious activity within our network. We promptly initiated an investigation of the matter and engaged cybersecurity specialists to assist with the incident response. As a result, we determined that certain files may have been accessed or acquired without authorization on February 15, 2025. We then undertook a comprehensive review of the affected data and, on or about September 12, 2025, learned that some personal health information was involved. Please note, we have no evidence of the misuse, or attempted misuse, of any potentially impacted information.

**What Information was Involved?** The information may have included your name as well as your name, address, date of birth, Social Security number, driver's license number, and medical record number.

**What We Are Doing.** As soon as we discovered the incident, we took the steps described above. We also implemented additional measures to reduce the risk of a similar incident occurring in the future.

We are also offering you the ability to enroll in 12 months of complimentary credit monitoring and identity protection services through Epiq Privacy Solutions ID Standard, which provides credit monitoring through Equifax, ID Restoration services, and dark web monitoring. The deadline for enrolling in these services is **December 31, 2025**.

**What You Can Do.** You can follow the recommendations on the following page to help protect your personal information. You can also enroll in the identity protection services, which are offered at no cost to you.

**How To Enroll:**
1) Visit www.privacy-assist.com
2) Enter the following activation code, **ABCU-4565-9314-6674-5493** and complete the enrollment form



**GOSHEN**

Secure Processing Center
P.O. Box 3826
Suwanee, GA 30024



51 1 21030 ****************AUTO**5-DIGIT 28328
Jennifer Stuckey
266 Outlaw Rd
Dudley, NC 28333-7172

ˡᵐˡˡᵗˡˡᵗˡˡᵐˡˡˡᵗˡᵗˡˡˡˡᵗˡˡˡᵗˡˡˡᵗ

September 17, 2025

Re: Notice of Data Security Incident

Dear Jennifer Stuckey:

Goshen Medical Center is writing to notify you of a data security incident which may have involved your personal information. We take the privacy and security of all information within our possession very seriously. Please read this letter carefully as it contains information regarding the incident and information about steps that you can take to help protect your information.

**What Happened?** On March 4, 2025, we detected suspicious activity within our network. We promptly initiated an investigation of the matter and engaged cybersecurity specialists to assist with the incident response. As a result, we determined that certain files may have been accessed or acquired without authorization on February 15, 2025. We then undertook a comprehensive review of the affected data and, on or about September 12, 2025, learned that some personal health information was involved. Please note, we have no evidence of the misuse, or attempted misuse, of any potentially impacted information.

**What Information was Involved?** The information may have included your name as well as your name, address, date of birth, Social Security number, driver's license number, and medical record number.

**What We Are Doing.** As soon as we discovered the incident, we took the steps described above. We also implemented additional measures to reduce the risk of a similar incident occurring in the future.

We are also offering you the ability to enroll in 12 months of complimentary credit monitoring and identity protection services through Epiq Privacy Solutions ID Standard, which provides credit monitoring through Equifax, ID Restoration services, and dark web monitoring. The deadline for enrolling in these services is **December 31, 2025**.

**What You Can Do.** You can follow the recommendations on the following page to help protect your personal information. You can also enroll in the identity protection services, which are offered at no cost to you.

**How To Enroll:**
1) Visit www.privacysolutionsid.com and click "Activate Account"
2) Enter the following activation code, **ABCU-6916-6033-7429-5642** and complete the enrollment form
3) Complete the identity verification process
4) You will receive a separate email from noreply@privacysolutions.com confirming your account has been set up successfully and will include an Access Your Account link in the body of the email that will direct you to the log-in page



**GOSHEN**

Secure Processing Center
P.O. Box 3826
Suwanee, GA 30024

260 1 101354 ********************ALL FOR AADC 283
Lynwood White
2869 Tram Rd
Deep Run, NC 28525

September 17, 2025

Re: Notice of Data Security Incident

Dear Lynwood White:

Goshen Medical Center is writing to notify you of a data security incident which may have involved your personal information. We take the privacy and security of all information within our possession very seriously. Please read this letter carefully as it contains information regarding the incident and information about steps that you can take to help protect your information.

**What Happened?** On March 4, 2025, we detected suspicious activity within our network. We promptly initiated an investigation of the matter and engaged cybersecurity specialists to assist with the incident response. As a result, we determined that certain files may have been accessed or acquired without authorization on February 15, 2025. We then undertook a comprehensive review of the affected data and, on or about September 12, 2025, learned that some personal health information was involved. Please note, we have no evidence of the misuse, or attempted misuse, of any potentially impacted information.

**What Information was Involved?** The information may have included your name as well as your name, address, date of birth, Social Security number, driver's license number, and medical record number.

**What We Are Doing.** As soon as we discovered the incident, we took the steps described above. We also implemented additional measures to reduce the risk of a similar incident occurring in the future.

We are also offering you the ability to enroll in 12 months of complimentary credit monitoring and identity protection services through Epiq Privacy Solutions ID Standard, which provides credit monitoring through Equifax, ID Restoration services, and dark web monitoring. The deadline for enrolling in these services is **December 31, 2025**.

**What You Can Do.** You can follow the recommendations on the following page to help protect your personal information. You can also enroll in the identity protection services, which are offered at no cost to you.

**How To Enroll:**
1) Visit www.privacysolutionsid.com and click "Activate Account"
2) Enter the following activation code, **ABCU-7620-3890-0012-8623** and complete the enrollment form
3) Complete the identity verification process
4) You will receive a separate email from noreply@privacysolutions.com confirming your account has been set up successfully and will include an Access Your Account link in the body of the email that will direct you to the log-in page



GOSHEN

secure Processing Center
.O. Box 3826
w-anec, GA 30024

12511 51955 *************** AUTO**5-DIGIT 27530
Decarlos McNair
301 Mercer St
Goldsboro, NC 27530-1336

September 17, 2025

Decarlos McNair
301 Mercer St
Goldsboro, NC 27530-1336

Re: Notice of Data Security Incident

Dear Decarlos McNair:

Goshen Medical Center is writing to notify you of a data security incident which may have involved your personal
information. We take the privacy and security of all information within our possession very seriously. Please read this letter
carefully as it contains information regarding the incident and information about steps that you can take to help protect your
information.

What Happened? On March 4, 2025, we detected suspicious activity within our network. We promptly initiated an
investigation of the matter and engaged cybersecurity specialists to assist with the incident response. As a result, we
determined that certain files may have been accessed or acquired without authorization on February 15, 2025. We then
undertook a comprehensive review of the affected data and, on or about September 12, 2025, learned that some personal
health information was involved. Please note, we have no evidence of the misuse, or attempted misuse, of any potentially
impacted information.

What Information was Involved? The information may have included your name as well as your name, address, date of
birth, Social Security number, driver's license number, and medical record number.

What We Are Doing: As soon as we discovered the incident, we took the steps described above. We also implemented
additional measures to reduce the risk of a similar incident occurring in the future.

We are also offering you the ability to enroll in 12 months of complementary credit monitoring and identity protection
services through Epiq Privacy Solutions ID Standard, which provides credit monitoring through Equifax, ID Restoration
services, and dark web monitoring. The deadline for enrolling in these services is December 31, 2025.

What You Can Do. You can follow the recommendations on the following page to help protect your personal information
you can also enroll in the identity protection services, which are offered at no cost to you.

How To Enroll:

1) Visit www.privacysolutionsid.com and click "Activate Account".
2) Enter the following activation code, ABCU-8005-5790-6769-4460 and complete the enrollment form
3) Complete the identity verification process
4) You will receive a separate email from noreph@privacysolutions.com confirming your account has been set up
   successfully and will include an Access Your Account link in the body of the email that will direct you to the log-
   in page



**GOSHEN**

Secure Processing Center
P.O. Box 2826
Suwanee, GA 30024



414 1 C9686 ********************AUTH**A CHOT1 28323
Melissa Mealer

[redacted]

September 17, 2025

Re: Notice of Data Security Incident

Dear Melissa Mealer:

Goshen Medical Center is writing to notify you of a data security incident which may have involved your personal information. We take the privacy and security of all information within our possession very seriously. Please read this letter carefully as it contains information regarding the incident and information about steps that you can take to help protect your information.

**What Happened?** On March 4, 2025, we detected suspicious activity within our network. We promptly initiated an investigation of the matter and engaged cybersecurity specialists to assist with the incident response. As a result, we determined that certain files may have been accessed or acquired without authorization on February 15, 2025. We then undertook a comprehensive review of the affected data and, on or about September 12, 2025, learned that some personal health information was involved. Please note, we have no evidence of the misuse, or attempted misuse, of any potentially impacted information.

**What Information was Involved?** The information may have included your name as well as your name, address, date of birth, Social Security number, driver's license number, and medical record number.

**What We Are Doing.** As soon as we discovered the incident, we took the steps described above. We also implemented additional measures to reduce the risk of a similar incident occurring in the future.

We are also offering you the ability to enroll in 12 months of complimentary credit monitoring and identity protection services through Epiq Privacy Solutions ID Standard, which provides credit monitoring through Equifax, ID Restoration services, and dark web monitoring. The deadline for enrolling in these services is **December 31, 2025**.

**What You Can Do.** You can follow the recommendations on the following page to help protect your personal information. You can also enroll in the identity protection services, which are offered at no cost to you.

**How To Enroll:**
1) Visit www.privacysolutionsid.com and click "Activate Account"
2) Enter the following activation code, [redacted] and complete the enrollment form
3) Complete the identity verification process
4) You will receive a separate email from noreply@privacysolutions.com confirming your account has been set up successfully and will include an Access Your Account link in the body of the email that will direct you to the log-in page

5) Enter your log-in credentials.
6) You will be directed to your dashboard and activation is complete.

**Epiq Privacy Solutions ID Standard includes:**

- **Credit Monitoring with Alerts**
  Monitors your credit file(s) for key changes, with alerts such as credit inquiries, new accounts, and public records.
- **Credit Protection**
  Credit Report Lock/Freeze assists with blocking access to the credit file for the purposes of extending credit (with certain exceptions).
- **Dark Web (lite) Monitoring**
  Monitoring 1 email address, phone, name, DOB, and SSN on the dark web. Includes retrospective report as well as ongoing monitoring.
- **Identity Restoration**
  Dedicated ID restoration specialists who assist with ID theft recovery.
- **Change of Address**
  Monitors the National Change of Address (NCOA) database and the U.S. Postal Service records to catch unauthorized changes to users' current or past addresses.

**For More Information.** Further information about how to protect your personal information appears on the following page. If you have questions or need assistance, please call 877-396-3238, Monday through Friday, 9:00 a.m. to 9:00 p.m. Eastern time. Epiq representatives have been fully versed on the incident and can answer questions or concerns you may have regarding protection of your personal information.

We take your trust in us and this matter very seriously. We deeply regret any worry or inconvenience that this may cause you.

Sincerely,

Goshen Medical Center
444 S. SW Center Street
Faison, NC 28341

## Steps You Can Take to Help Protect Your Personal Information

**Review Your Account Statements and Notify Law Enforcement of Suspicious Activity:** As a precautionary measure, we recommend that you remain vigilant by reviewing your account statements and credit reports closely. If you detect any suspicious activity on an account, you should promptly notify the financial institution or company with which the account is maintained. You also should promptly report any fraudulent activity or any suspected incidence of identity theft to proper law enforcement authorities, your state attorney general, and/or the Federal Trade Commission (the "FTC").

**Copy of Credit Report:** You may obtain a free copy of your credit report from each of the three major credit reporting agencies once every 12 months by visiting www.annualcreditreport.com/, calling toll-free 1-877-322-8228, or by completing an Annual Credit Report Request Form and mailing it to Annual Credit Report Request Service, P.O. Box 105281, Atlanta, GA 30348. You also can contact one of the following three national credit reporting agencies:

| Equifax | Experian | TransUnion |
|---|---|---|
| P.O. Box 105851 | P.O. Box 9532 | P.O. Box 2000 |
| Atlanta, GA 30348 | Allen, TX 75013 | Chester, PA 19016 |
| 1-800-525-6285 | 1-888-397-3742 | 1-833-799-5355 |
| www.equifax.com | www.experian.com | www.transunion.com/get-credit-report |

**Fraud Alert:** You may want to consider placing a fraud alert on your credit report. An initial fraud alert is free and will stay on your credit file for at least one year. The alert informs creditors of possible fraudulent activity within your report and requests that the creditor contact you prior to establishing any accounts in your name. To place a fraud alert on your credit report, contact any of the three credit reporting agencies identified above. Additional information is available at www.annualcreditreport.com. For TransUnion: www.transunion.com/fraud-alerts.

**Security Freeze:** You have the right to put a security freeze on your credit file for up to one year at no cost. This will prevent new credit from being opened in your name without the use of a PIN number that is issued to you when you initiate the freeze. A security freeze is designed to prevent potential creditors from accessing your credit report without your consent. As a result, using a security freeze may interfere with or delay your ability to obtain credit. You must separately place a security freeze on your credit file with each credit reporting agency. In order to place a security freeze, you may be required to provide the consumer reporting agency with information that identifies you including your full name, Social Security number, date of birth, current and previous addresses, a copy of your state-issued identification card, and a recent utility bill, bank statement or insurance statement. For TransUnion: www.transunion.com/credit-freeze.

**Additional Free Resources:** You can obtain information from the consumer reporting agencies, the FTC, or from your respective state Attorney General about fraud alerts, security freezes, and steps you can take toward preventing identity theft. You may report suspected identity theft to local law enforcement, including to the FTC or to the Attorney General in your state.

**Federal Trade Commission**
600 Pennsylvania Ave, NW
Washington, DC 20580
consumer.ftc.gov
877-438-4338

**California Attorney General**
1300 I Street
Sacramento, CA 95814
www.oag.ca.gov/privacy
800-952-5225

**Maryland Attorney General**
200 St. Paul Place
Baltimore, MD 21202
www.marylandattorneygeneral.gov/Pages/CPD
888-743-0023

**New York Attorney General**
The Capitol
Albany, NY 12224
800-771-7755
ag.ny.gov

**Oregon Attorney General**
1162 Court St., NE
Salem, OR 97301
www.doj.state.or.us/consumer-protection
877-877-9392

**Rhode Island Attorney General**
150 South Main Street
Providence, RI 02903
www.riag.ri.gov
401-274-4400

**Iowa Attorney General**
1305 E. Walnut Street
Des Moines, Iowa 50319
www.iowaattorneygeneral.gov
888-777-4590

**Kentucky Attorney General**
700 Capitol Avenue, Suite 118
Frankfort, Kentucky 40601
www.ag.ky.gov
502-696-5300

**NY Bureau of Internet and Technology**
28 Liberty Street
New York, NY 10005
www.dos.ny.gov/consumerprotection/
212.416.8433

**NC Attorney General**
9001 Mail Service Center
Raleigh, NC 27699
ncdoj.gov/protectingconsumers/
877-566-7226

**Washington D.C. Attorney General**
400 S 6th Street, NW
Washington, DC 20001
oag.dc.gov/consumer-protection
202-442-9828

**You also have certain rights under the Fair Credit Reporting Act (FCRA)**: These rights include to know what is in your file; to dispute incomplete or inaccurate information; to have consumer reporting agencies correct or delete inaccurate, incomplete, or unverifiable information; as well as other rights. For more information about the FCRA, and your rights pursuant to the FCRA, please visit www.consumer.ftc.gov/sites/default/files/articles/pdf/pdf-0096-fair-credit-reporting-act.pdf.



**GOSHEN**

Secure Processing Center
P.O. Box 3826
Suwanee, GA 30024

110 1 44948 ****************** AUTO**5-DIGIT 27510
Gloria Williams



September 17, 2025

Re: Notice of Data Security Incident

Dear Gloria Williams:

Goshen Medical Center is writing to notify you of a data security incident which may have involved your personal information. We take the privacy and security of all information within our possession very seriously. Please read this letter carefully as it contains information regarding the incident and information about steps that you can take to help protect your information.

**What Happened?** On March 4, 2025, we detected suspicious activity within our network. We promptly initiated an investigation of the matter and engaged cybersecurity specialists to assist with the incident response. As a result, we determined that certain files may have been accessed or acquired without authorization on February 15, 2025. We then undertook a comprehensive review of the affected data and, on or about September 12, 2025, learned that some personal health information was involved. Please note, we have no evidence of the misuse, or attempted misuse, of any potentially impacted information.

**What Information was Involved?** The information may have included your name as well as your name, address, date of birth, Social Security number, driver's license number, and medical record number.

**What We Are Doing.** As soon as we discovered the incident, we took the steps described above. We also implemented additional measures to reduce the risk of a similar incident occurring in the future.

We are also offering you the ability to enroll in 12 months of complimentary credit monitoring and identity protection services through Epiq Privacy Solutions ID Standard, which provides credit monitoring through Equifax, ID Restoration services, and dark web monitoring. The deadline for enrolling in these services is **December 31, 2025**.

**What You Can Do.** You can follow the recommendations on the following page to help protect your personal information. You can also enroll in the identity protection services, which are offered at no cost to you.

**How To Enroll:**
1) Visit www.privacysolutionsid.com and click "Activate Account"
2) Enter the following activation code, **ABCU-9838-0337-3272-3124** and complete the enrollment form
3) Complete the identity verification process
4) You will receive a separate email from noreply@privacysolutions.com confirming your account has been set up successfully and will include an Access Your Account link in the body of the email that will direct you to the log-in page